(text box: 1) NO. 5-00-0147

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

________________________________________________________________________

DEBORAH TODT, DANIEL McKAY, ELLA )  Appeal from the

MONROE, BONNIE McMINN, and All Others )  Circuit Court of

Similarly Situated, )  Madison County.

)

     Plaintiffs-Appellees, ) 

)

)  No. 97-L-1020

)

AMERITECH CORPORATION, )

AMERITECH SERVICES, INC., THE OHIO BELL )

TELEPHONE COMPANY, MICHIGAN BELL )

TELEPHONE COMPANY, INDIANA BELL )

TELEPHONE COMPANY, and WISCONSIN BELL, )

INC., )

)

     Defendants-Appellees )

)  Honorable

(Sheila Kennedy and Judy Brunetti, Intervening )  Randall A. Bono,

Plaintiffs-Appellants). )  Judge, presiding.

________________________________________________________________________

PRESIDING JUSTICE MAAG delivered the opinion of the court:

The plaintiffs, Deborah Todt, Ella Monroe, Bonnie McMinn, and Daniel McKay, individually and on behalf of all others similarly situated, filed a class action suit and settlement on November 10, 1997, in order to settle a suit against the defendants, Ameritech Corp. (Ameritech) and Ameritech Services, Inc. (ASI), The Ohio Bell Telephone Company (Ohio Bell), Indiana Bell Telephone Company (Indiana Bell), Wisconsin Bell, Inc. (Wisconsin Bell), and Michigan Bell Telephone Company (Michigan Bell).  When this class action suit (the Todt case) was filed, putative class action suits were already pending against Ameritech in Indiana, Michigan, and Ohio.  See Monroe v. Indiana Bell Telephone Co., No. 2:95-CV-376 JM (S.D. Ind. October 23, 1995); Seavers v. Ameritech Corp., No. 95-CV-500 (Ohio Cir. Ct., Erie Co. November 14, 1995); Hankins v. Ameritech Corp., No. 96-623978-NP (Mich. Cir. Ct., Wayne Co. May 21, 1996).  These cases concerned Ameritech's marketing and billing practices with respect to inside wire maintenance service (IWMS) plans.  Ameritech also provides telephone service in Illinois.  On that same date, an "Agreement of Class Action Settlement" was achieved in Folkerts v. Ameritech Corp., No. 95-L-912 (Ill. Cir. Ct., Madison Co. March 10, 1995) (Folkerts).  Class counsel in the present case were also class counsel in the Folkerts case.  The Folkerts case was composed of Illinois plaintiffs and alleged violations of Illinois law, and the Todt case claimed violations of the consumer-fraud statutes in Indiana, Michigan, Ohio, and Wisconsin.

On November 12, 1997, the circuit court issued an order granting preliminary approval of the Todt case.  On April 6, 1998, and April 20, 1998, a fairness hearing was held.  On October 30, 1998, the circuit court created two subclasses.  One subclass was composed of the residents of Michigan, Ohio, and Wisconsin (Tri-state subclass).  The other subclass was composed of only the residents of Indiana (Indiana subclass).  That same day, the circuit court approved the settlement agreement as to the Tri-state subclass.  After renotice, the circuit court held supplemental fairness hearings pertaining to the Indiana subclass.  The circuit court entered its final judgment on June 28, 1999.  Sheila Kennedy and Judy Brunetti (Kennedy intervenors) moved for a reconsideration.  On February 8, 2000, the circuit court issued its final order approving the settlement agreement as to the Indiana subclass.  The Kennedy intervenors filed this appeal on March 7, 2000, claiming that the circuit court erred when it approved the class action settlement as to the Indiana subclass.

The relevant facts are as follows.  Ohio Bell, Indiana Bell, Wisconsin Bell, and Michigan Bell (collectively, the State Bell Companies) are wholly owned subsidiaries of Ameritech and are engaged in the telecommunications business in their respective states.  ASI is a corporation that is owned and controlled by the State Bell Companies.  Both Ameritech companies are Illinois corporations.  The State Bell Companies offered for sale certain products and services, including IWMS.  The dispute in the instant case centered around Ameritech's, ASI's, and the State Bell Companies' marketing and billing practices with regard to the IWMS plan.  The circuit court entered an order on November 12, 1997, certifying a class for settlement purposes only, authorizing notice to be mailed to individual class members and by publication of notice in the USA Today newspaper, and preliminarily enjoining all class members from prosecuting any actions asserting any of the settled claims.  Various objectors claimed that the settlement agreement was negotiated without notice to the counsel involved in the same litigation pending in other states.

The circuit court then held fairness hearings on April 6, 1998, and April 20, 1998.  Some intervenors (Michigan intervenors) were counsel for the plaintiffs in the case of 
Converse v. Ameritech Corp.
, 179 F.R.D. 533, 539 (W.D. Mich. 1997).  Counsel in the 
Converse
 case were never able to certify a class.  The Michigan intervenors focused their efforts on obtaining an award of attorney fees.  The Madison County circuit court determined that the Michigan intervenors had done nothing of benefit to the class.  The Michigan intervenors filed an appeal but later withdrew it.

Some intervenors (Ohio intervenors) were cocounsel in Seavers v. Ameritech, No. 95-CV-500 (Ohio Cir. Ct., Erie Co. November 14, 1995).  The record shows that prior to the settlement in the Todt case, counsel in Seavers had not done any discovery for 2½ years.  As soon as the settlement in the Todt case was announced, the Ohio intervenors attempted to resurrect their lawsuit despite the Madison County circuit court's injunction precluding them from doing so.  Although the Ohio intervenors ceased efforts to pursue the Ohio litigation, they did not appeal the Madison County circuit court's October 30, 1998, order.

A few weeks after the class notice was mailed in the Todt case, counsel for some intervenors (Wisconsin intervenors) filed a copycat lawsuit in Wisconsin circuit court.  Mertz v. Ameritech Corp., No. 97-CV-3335 (Wis. Cir. Ct., Dane Co. December 18, 1997).  These parties and their counsel had never filed an IWMS action against the defendants.  They proceeded with this action in violation of the Madison County circuit court's injunction precluding parallel actions.  Counsel took the position that they were not bound by the circuit court's orders.  Wisconsin counsel agreed that they were parties to the litigation as of April 6, 1998, and they agreed to stop the litigation in Wisconsin.  Wisconsin counsel then participated in the fairness hearing on that date.  After the circuit court approved the settlement, the same counsel disobeyed the circuit court's order by continuing the litigation in Wisconsin.  After Wisconsin counsel refused to comply with the circuit court's order, class counsel and Ameritech's counsel jointly initiated contempt proceedings.  After a hearing, the circuit court found the seven individuals and their counsel in contempt.  The circuit court allowed them to purge themselves of the contempt by complying with the injunction and dismissing the lawsuit by 5 p.m. on the Monday following the Friday afternoon hearing.  On July 27, 1999, the Madison County circuit court entered an order purging Wisconsin counsel and the seven individual class members from contempt due to the fact that counsel filed a motion to voluntarily dismiss the Wisconsin case.  The Wisconsin intervenors did not appeal the October 30, 1998, order.

Counsel for some intervenors (Indiana intervenors) had been cocounsel with class counsel in the Monroe case in Indiana.  They had never attained class certification.  The Indiana intervenors filed a motion for disqualification or recusal and a motion for leave to take the depositions of the Honorable Randall A. Bono and counsel.  These motions were denied, as well as other motions.  In fact, the circuit court stated that the settlement was achieved "in spite of" Indiana counsel and the Indiana intervenors.  The Indiana intervenors eventually withdrew.

The objectors claimed that there had been a simultaneous negotiation of the Folkerts and Todt settlements.  However, Stephen Tillery, class counsel, testified that there was no evidence to support the allegation of the simultaneous negotiation of the Folkerts and Todt settlements.  Seven witnesses testified regarding the value, fairness, and adequacy of the settlement.  Additionally, seven experts provided affidavits on this same issue.  The intervenors' experts challenged the value of the settlement benefits, and the appellees presented evidence that the settlement was fair and adequate.

Leroy Grossman, professor of economics and chair of the economics department at St. Louis University, gave the most conservative economic analysis of the settlement that was presented by the appellees, in the form of an affidavit.  Grossman stated that the settlement divided the class members into two different groups–(1) persons who were still enrolled in Linebacker agreements and (2) persons who were not still enrolled in Linebacker agreements but who had been enrolled between January 1, 1987, and November 7, 1997.  Based on Ameritech's estimates, there were approximately 4.63 million IWMS subscribers in Michigan, Indiana, Ohio, and Wisconsin.  There were 11.58 million former subscribers in those same states.  According to Grossman's analysis, a summary of the benefits to the class is as follows.

1.  Pay-Per-Use Services.  Each class member who is a Linebacker subscriber will receive one activation of a pay-per-use (PPU) service (three-way calling, automatic call-back, or repeat dialing) for nine consecutive months.  Ameritech values this service at $7.02 per class member.  However, because it costs Ameritech consumers $0.75 for each PPU service, Grossman computed the actual value to be $6.75 per class member who is a Linebacker subscriber, for a total value of $31,252,500.  This assumes that 100% of the class members who are Linebacker subscribers will benefit.  To the extent that some class members currently subscribe to all three services, those class members would receive no benefit.  Ameritech estimated that less than 5% of the customers subscribe to all three services.  Grossman opined that assuming that 5% of the class members who are Linebacker subscribers are enrolled in all three services, the actual value to the class is 95% of $31,252,500, or $29,689,875.

2.  Prepaid Calling Cards.  Ameritech valued the prepaid calling cards at $5 per card.  Grossman estimated that since each class member who is a Linebacker subscriber will receive two cards, the value of this benefit is $46.3 million to subscribers.  Because each class member who is a former Linebacker subscriber is eligible to receive one card, the value of this benefit is $57.9 million to former subscribers.  Grossman opined that if 10% of the former subscribers who are class members choose to receive the free card, the redemption value of the cards to former subscribers is $5,790,000.  Therefore, Grossman estimated that the total benefit to the class, when considering redemption value, is $52,090,000.  We note parenthetically that this part of the settlement was later amended to provide three cards to Indiana class members.

3.  Wire Replacement Services.  Ameritech agreed to give an automatic 50% off the cost of rewiring nonstandard telephone wiring for 60 months for class members who are Linebacker subscribers.  Based on Ameritech's data, the average current charge for rewiring nonstandard wire is $400, and that charge would be reduced to $200.  Ameritech estimated that 15% to 25% of the class members who are Linebacker subscribers have nonstandard wiring.  Grossman assumed that 15% of the class members who are Linebacker subscribers have nonstandard wiring and that, based on data provided by Ameritech, 10% of those class members would request or require rewiring each year for the next five years.  Grossman assumed an attrition rate of 8.5%.  Ameritech documents establish that the attrition or churn rate ranges between 7% and 10%.  Grossman assumed an interest rate of 6.5% based upon the current yield of five-year corporation bonds and a projected 3%-per-year increase in the price of such services as a result of inflation.  Considering all of these factors, Grossman determined that the net real discount rate to be applied to the annual savings by the class as a result of the 50% reduction in the cost of telephone wire replacement was 12%.  Grossman opined that the present value to class members of the $69,450,000 benefit to be associated with rewiring provisions of the settlement is $50,070,341.

Ameritech also agreed to eliminate the nonstandard-wire exclusion of the Linebacker plan and repair nonstandard wiring under the Linebacker plan.  The average charge for repairs in connection with nonstandard wiring is $250.  Based upon the aforementioned attrition rate, interest rate, and rate of inflation, Grossman determined that the net real discount rate to be applied to the annual savings by the class as a result of the elimination of the nonstandard-wire exclusion in the Linebacker plan was 12%.  Grossman opined that the present value to the class of the $86,812,500 benefit over a five-year period is $62,587,927.

4.  Customer Service.  Ameritech also agreed to improve the quality of its services to its customers by training and supervising its employees regarding the sale and marketing of IWMS and enhancing information and services provided to customers.  Grossman stated in detail the lengths to which Ameritech would go to disseminate information to its consumers.  Grossman claimed that it was impossible to accurately determine the value of this benefit, and then he opined that the value to the class is $4 million.

5.  Attorney Fees and Legal Expenses.  Ameritech also agreed to pay the attorney fees and legal expenses for the class.  Although Grossman noted that he had not placed a value on the notice that had been published in USA Today, the notice that Ameritech had sent to its customers, and the additional notice that Ameritech will send to the class when the settlement is approved, he stated that the costs associated with notice have been and will continue to be "substantial."  Grossman opined that the benefit to the class for Ameritech paying its attorney fees and legal expenses "is up to and including" $1.9 million.

A summary of Grossman's analysis of the benefits to the class is as follows:

PPU $ 29,689,875

Prepaid Calling Cards $ 52,090,000

Wire Replacement Services

Rewiring $ 50,070,341

Elimination of Exclusion $ 62,587,927

Enhanced Customer Service $   4,000,000

Legal Fees & Expenses 
$   1,900,000

Total Benefit to the Class $200,338,143

The Michigan intervenors introduced the testimony of Michael Fox, a principal of a consulting firm named Competitive Communications Group.  Fox explained that his firm specializes in telecommunications consulting, focusing primarily on the competitive aspects of telecommunications.  While Fox generally criticized the noncash benefits of the prepaid telephone cards, he also noted that the strict limitations that were imposed upon the use of the cards diminished the value of the cards.  Fox specifically pointed out that the cards must be used for IntraLATA toll calling and are limited to an artificial geographic boundary within a particular state.  Moreover, the cards must be used at Ameritech pay phones and are  charged for only 12 or 13 minutes of calling.  The intervenors' motions to conduct discovery with respect to the fairness of the settlement were denied.  The court noted that no intervenor submitted formal discovery requests for the court's approval, either before or after the hearing.

At the end of the April 6, 1998, hearing, the circuit court scheduled another hearing for April 20, 1998, to provide the intervenors with another opportunity to respond to the evidence.  The intervenors failed to conduct any further cross-examination and did not call any of the parties' affidavit witnesses for examination on the witness stand.  Additionally, the following governmental agencies that possessed responsibility for such matters filed objections to the settlement: (1) the State of Indiana Office of Utility Consumer Counselor, (2) the Ohio Consumer Counselor, (3) the Public Utility Commission of Ohio, (4) the Public Service Commission of Wisconsin, (5) The Wisconsin Citizens' Utility Board, (6) the Attorney General for the State of Michigan, (7) the Attorney General for the State of Ohio, and (8) the Attorney General for the State of Wisconsin.

Ameritech claimed that none of these parties had standing to complain in an Illinois court.  The circuit court agreed and stated as follows: "None of the entities mentioned in the preceding paragraph is a Class Member and, thus, none has standing to object to the proposed settlement."  The court also noted that none of the aforementioned entities filed any other pleadings or papers that would establish their standing to participate in the proceedings and that none of them appeared at the fairness hearing.  The court stated that none of them submitted any evidence by affidavit or any other documentary evidence.  Moreover, the circuit court stated: "[S]ome of these entities purport to protect (and, in the cases of the Attorneys General, are duty-bound to protect) consumers in  their states, yet over the ten[-]  year period at issue in this litigation, very little has been done to protect IWMS subscribers from the kinds of practices the [p]laintiffs have alleged in this case.  Indeed, insofar as the Court is aware, the three Attorneys General have done nothing to protect IWMS subscribers."  The court noted that although the aforementioned parties lacked standing, it had carefully considered the objections that had been raised.  The circuit court later noted that an objection had been made that it lacked jurisdiction over the class members who were not Illinois residents.  The circuit court disagreed and stated that the due process requirements of adequate notice, an opportunity to be heard, and an opportunity to object to the settlement was given to subclass members.  The court stated, "The named [p]laintiffs having consented to the jurisdiction, the Court may bind those Subclass Members from the States of Michigan, Ohio, and Wisconsin."  The court then overruled the objection.  The circuit court then approved the settlement with respect to the class members in Michigan, Ohio, and Wisconsin.  No party from Michigan, Ohio, or Wisconsin filed a notice of appeal.

On July 9, 1998, the circuit court sent a letter to all counsel expressing its concerns about certain aspects of the settlement.  More specifically, the court was concerned that the class notice to the Indiana class members might have been inadequate.  Class counsel and the defendants' counsel negotiated amendments to the proposed settlement and on August 3, 1998, filed with the court an amendment to the settlement agreement.  The amended agreement addressed the circuit court's concerns, including an agreement to send a second class notice to Indiana class members.  The circuit court took the matter under advisement.

Additionally, in August of 1998, the attorneys in Sloop v. Ameritech Corp., No. EV 95-128-C-R/H (N.D. Ind. 1998), moved to certify a class in Indiana and stay the Todt proceedings.  Instead, the Indiana federal court stayed proceedings in the Sloop case pending the outcome in the Todt case.  One of the counsel in the Sloop case arranged to have Sheila Kennedy and Judy Brunetti represented by counsel as intervenors in this case, where they appeared in December of 1998.

In this case, the circuit court entered an 80-page order on October 30, 1998, dividing the class into two subclasses–an Indiana subclass and a Michigan, Ohio, and Wisconsin subclass.  In order to ensure that the Indiana subclass was given an opportunity to offer objections to the proposed settlement, the court ordered that a supplemental notice be sent to the Indiana class members.  The supplemental notice was sent to the Indiana subclass by direct mailing and publication in USA Today.  The circuit court conducted supplemental hearings with respect to the Indiana class on December 17, 1998, January 28, 1999, and June 18, 1999.

The Kennedy intervenors make the following claim in their brief: "The [f]ourth [a]mendment [to the class action settlement], filed April 20, 1999, was approved by the [c]ourt that same day it was filed without waiting for comment from the Kennedy [i]ntervenors.  The Kennedy [i]ntervenors subsequently filed their objections later even though approval had already been granted.  The objections were overruled.  By the [f]ifth [a]mendment, Ameritech was sufficiently confident of approval that it implemented the proposed changes 
immediately
 without waiting either for [
sic
] objection from counsel or approval by the [c]ourt."  (Emphasis in original.)  We note parenthetically that although the Indiana subclass intervenors make much ado in their statement of facts regarding the aforementioned amendments and objections, they fail to argue any issue with respect to the amendments and objections; hence, this issue is waived and will not be addressed.  See 188 Ill. 2d R. 341(e)(7) (points not argued are waived).  Additionally, we note that the Indiana intervenors also complain about the notice and scheduling of the June 18, 1999, hearing.  We note again, however, that they fail to argue any issue with respect to the notice and scheduling of the June 18, 1999, hearing; hence, this issue is waived and will not be addressed by this court.  See 188 Ill. 2d R. 341(e)(7).

The circuit court then issued a second order on June 28, 1999, approving the settlement with respect to the Indiana subclass.  The court adopted the findings in its October 30, 1998, order and addressed the strengths of the case for the plaintiffs on the merits.

The court noted that the Indiana consumer-fraud claim was narrower than the claims that were based upon the consumer-fraud statutes in the other states.  The court specifically stated that the consumer-fraud statutes in the other states prohibited deceptive and misleading practices in general, while the Indiana consumer-fraud statute applies to 16 specific acts.  The court stated that it was not readily apparent that any of those 16 acts applied to the factual claims in Todt or in the competing litigation pending in Indiana.  The court also determined that Ameritech's conduct was not different in any substantive way in any of the four states.  The court found that the Indiana subclass faced statute-of-limitations issues and that this had been acknowledged by the Indiana subclass.  The court also addressed the purported "negative option" issue raised by the Indiana intervenors.  The court explained that the Indiana intervenors' characterization of the price increases as "negative options" was not akin to the negative enrollment that had occurred in Illinois in the Folkerts case.  The court stated, "The Indiana claims are thus similar to those cases which have generally not been successful."  The court found meritless the Indiana intervenors' claim that the proposed settlement was unfair to the Indiana subclass because Ameritech made a $20 million profit in Indiana while it posted $150 million in losses in the other states.  The court noted that if Ameritech had defrauded its customers, it would still be required to compensate them even if the net result was a loss.  The Indiana intervenors filed a belated allegation of fraud by Ameritech regarding its advertising, which stated that if a customer canceled his inside-wire-repair-service subscription, his Linebacker (diagnostic) service would also be terminated.  The court noted, "[I]t is incomprehensible why this [c]ourt has not been provided with unambiguous and substantial evidence of such a fraud."  The court acknowledged the weakness in the Indiana case and stated that there was a substantial likelihood that there would be no recovery for the Indiana subclass if the litigation proceeded, and "given the scant nature of the Kennedy [i]ntervenors' eleventh-hour evidence, this [c]ourt is not prepared to disapprove the [p]roposed [s]ettlement on this basis."  Finally, the court stated that the Indiana intervenors had failed to undertake any analysis of their claims based on the law of their respective states.  The court determined that the evidence was overwhelming that the settlement should be approved.  The court pointed out that the settlement was better for the Indiana subclass than for the Tri-state subclass.

Indiana intervenors Danny Coultas, Nick Hipskind, and Dan Scales filed a motion to reconsider the circuit court's June 28, 1999, order.  That motion was denied on August 13, 1999.  Further motions were filed by the Kennedy intervenors.  After the circuit court directed that the intervenors file objections that were "strictly limited to" the fifth amendment, the Kennedy intervenors filed a motion to dismiss on November 30, 1999, almost one year after the Kennedy intervenors had joined the case and participated in three fairness hearings and filed several pleadings.  That motion was based upon a jurisdictional issue that had previously been raised and considered by the court.

The circuit court issued a memorandum and order on February 8, 2000, on all pending motions.  The court rejected the Kennedy intervenors' motion to dismiss and the remaining motions for reconsideration and to dismiss.  The Kennedy intervenors appeal.

Initially, we must address Ameritech's motion to strike section II, pages 5 through 7, of the Kennedy intervenors' reply brief because they raise an allegedly "new and completely untrue claim" that the circuit court had no jurisdiction over this case because Ameritech did not own Indiana Bell in 1987, the date of the first alleged wrongful conduct.

The Kennedy intervenors filed a motion in opposition to Ameritech's motion to strike, claiming, "This inaccurately characterizes the Kennedy argument."  The Kennedy intervenors acknowledge that they made the statement in their reply brief that the record does not disclose when Ameritech obtained ownership of Indiana Bell; however, the Kennedy intervenors state that they do not "make the date of Ameritech's acquisition of ownership material to [their] argument" that the circuit court had no jurisdiction over this case.  Since the parties agree that this is not an issue in this case, we will not consider it.  Additionally, we will disregard the Kennedy intervenors' references and issues with respect to the date of Ameritech's acquisition of Indiana Bell.  Hence, we deny Ameritech's motion to strike pages 5 through 7 of the Kennedy intervenors' reply brief; however, to the extent that the Kennedy intervenors raise new issues in their reply brief, we will not consider them.  See 
Stephens v. Industrial Comm'n
, 284 Ill. App. 3d 269, 274, 671 N.E.2d 763, 768 (1996) (arguments raised for the first time in a reply brief will not be addressed by the appellate court); 188 Ill. 2d R. 341(g).

Additionally, Ameritech takes exception to the fact that the Kennedy intervenors, in their reply brief, allege that the only defendant harming them was "from their home [s]tate, not the State of Illinois."

A review of the Todt complaint shows that Ameritech and ASI were named as defendants.  The complaint also states, "AMERITECH
, 
OHIO BELL, INDIANA BELL, WISCONSIN BELL[,] and MICHIGAN BELL 
constitute one unified corporate enterprise
 for purposes of Illinois long-arm statute 
and are, each and every one, the agent of each and every other in that each and every one acted on the other's behalf with the other's knowledge and/or consent
."  (Emphasis added).  The Todt complaint also states as follows:

"Beginning January 1, 1987, and continuing to date, defendants 
AMERITECH, ASI
, OHIO BELL, INDIANA BELL, WISCONSIN BELL[,] and MICHIGAN BELL 
individually and/or jointly
, by and through their agents, 
engaged in unlawful schemes and courses of conduct that induced class members to pay for IWMS through one or more of the following unfair and/or deceptive acts and/or practices 
***."  (Emphasis added.)

The complaint then lists all of the deceptive acts and/or practices that each and every one of the aforementioned companies allegedly engaged in.  Hence, we find the Kennedy intervenors' statement–that the only defendant harming them was "from their home [s]tate, not the State of Illinois"–to be without merit.

The Kennedy intervenors claim that the circuit court erred "as a matter of law in exercising jurisdiction over a multistate class action which (a) was composed exclusively of non-Illinois class members, (b) examined wrongful acts which occurred outside the State of Illinois, and (c) asserted claims based exclusively upon the [c]onsumer [f]raud [s]tatutes of foreign states."  The Kennedy intervenors claim in their reply brief, "This [claim] should properly be viewed as a challenge to subject matter jurisdiction."  Ameritech claims that the Kennedy intervenors' failure to raise this issue in a timely manner below constitutes waiver on appeal.  We disagree.

Issues concerning subject matter jurisdiction cannot be waived and can be raised at any time.  
Segers v. Industrial Comm'n
, 191 Ill. 2d 421, 427, 732 N.E.2d 488, 492 (2000).  Hence, the issue of subject matter jurisdiction is properly raised.

The Illinois Constitution vests the circuit courts with "jurisdiction to adjudicate all controversies."  
Steinbrecher v. Steinbrecher
, Nos. 89551, 89560, slip op. at 33 (September 27, 2001); see Ill. Const. 1970, art. VI, §9.  Hence, so long as a case presents a justiciable matter, the circuit court has jurisdiction.  Where a complaint states a case belonging to a general class over which the authority of the circuit court extends, jurisdiction attaches.  
People ex rel. Scott v. Janson
, 57 Ill. 2d 451, 459, 312 N.E.2d 620, 624 (1974).

In 
McFarlin v. McFarlin
, 384 Ill. 428, 430, 51 N.E.2d 520, 521 (1943), the Illinois Supreme Court stated: "Jurisdiction of the subject matter is the power of a court to hear and determine causes of the general class to which the proceeding in question belongs, and such jurisdiction is always conferred by law.  In its application to a certain controversy, jurisdiction means the power and authority to hear and determine the issues involved in the cause."  This statement of the law continues to be valid.  See 
Health Cost Controls v. Sevilla
, 307 Ill. App. 3d 582, 587, 718 N.E.2d 558, 562 (1999).  "Subject matter jurisdiction 'does not simply mean jurisdiction of the particular case before it, but the class of cases to which that case belongs.' "  
Health Cost Controls
, 307 Ill. App. 3d at 587, 718 N.E.2d at 562 (quoting 
Kemling v. Country Mutual Insurance Co.
, 107 Ill. App. 3d 516, 519-20, 437 N.E.2d 1253, 1256 (1982)).  Since the circuit court is a court of general jurisdiction, it is presumed to have jurisdiction to render any judgment, until the contrary is shown.  
Lorenz v. Siano
, 248 Ill. App. 3d 946, 951, 618 N.E.2d 666, 669 (1993).

The Kennedy intervenors in the instant case have failed to do so.  The case at hand presents a justiciable matter involving adverse legal interests, and the general question involves the legality of Ameritech's inside-wire-maintenance marketing practices.  The relief requested is money damages and injunctive relief.  The case before this court, a consumer-fraud case, clearly belongs to that general class of cases over which the circuit court is vested with subject matter jurisdiction.

The Kennedy intervenors' argument focuses on geographical considerations and claims that an Illinois court cannot exercise jurisdiction over nonresident class members.  We disagree.

In 
Miner v. Gillette Co.
, 87 Ill. 2d 7, 428 N.E.2d 478 (1981), the plaintiff brought an action on behalf of a nationwide class of persons alleging a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1979, ch. 121½, par. 261 
et seq.
) and various other theories.  Both the circuit and appellate courts relied on 
Spirek v. State Farm Mutual Automobile Insurance Co.
, 65 Ill. App. 3d 440, 382 N.E.2d 111 (1978), and determined that absent "minimum contact" with this state, Illinois courts are without jurisdiction to render a binding judgment over nonresident plaintiffs in a class action suit in that such a judgment would violate due process.  The Illinois Supreme Court reversed and held that the question of whether the "minimum contacts" test is applicable to nonresident plaintiffs in a class action case was addressed in 
Shutts v. Phillips Petroleum Co.
, 222 Kan. 527, 567 P.2d 1292 (1977).  
Miner
, 87 Ill. 2d 7, 428 N.E.2d 478.  The 
Shutts
 court determined that 
International Shoe Co. v. Washington
, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945), and the line of cases emanating from it dealt specifically with nonresident 
defendants
.  The 
Miner
 court, quoting 
Shutts
, stated as follows:

" 'Whether all nonresident plaintiffs in a class action are required to have 'minimum contacts' with the forum is a different matter.  Because a class action must necessarily proceed in the absence of almost every class member, 
we hold the residential makeup of the class membership is not controlling
.  [Citation.]  What is important is that the nonresident plaintiffs be given notice and an opportunity to be heard and that their rights be justly protected by adequate representation.  These are the essential requirements of due process, and they must be satisfied in any class action by every court, state or federal, regardless of the residences of the absent class members.  Therefore, while the essential element necessary to establish jurisdiction over nonresident defendants is some "minimum contacts" between the defendant and the forum state, 
the element necessary to the exercise of jurisdiction over nonresident plaintiff class members is procedural due process
.' "  (Emphasis added; original emphasis omitted.)  
Miner
, 87 Ill. 2d at 12-13, 428 N.E.2d at 481 (quoting 
Shutts
, 222 Kan. at 542-43, 567 P.2d at 1305.

In the instant case, a supplemental notice was sent to the Indiana subclass by direct mailing and by publication in USA Today.  Additionally, the circuit court conducted supplemental hearings for the Indiana subclass on three separate dates.  Since the nonresident plaintiffs were given notice and an opportunity to be heard, their rights were justly protected by adequate representation.

Although the Kennedy intervenors distinguish 
Miner
 from the case at hand, they implicitly recognize the futility of their jurisdictional argument by stating that in the case at hand, "the outer limits of [p]rocedural [d]ue [p]rocess might not have been exceeded."  The Kennedy intervenors then resort to a policy argument and claim that "sound judicial policy indicates that Illinois decline jurisdiction to become the national haven for multistate 'pre[]packaged' class actions brought for settlement purposes only, which do not involve any Illinois plaintiff, [any] Illinois statute, or any deceptive practices claimed to have taken place in Illinois."

It is clear from the aforementioned statement by the Kennedy intervenors that they have resorted to a policy argument, implicitly asking this court to apply the doctrine of abstention even though they do not cite any case law to support that proposition.  We recognize that in 
Babcock v. Farwell
, 245 Ill. 14, 91 N.E. 683 (1910), and 
Voorhees v. Mason
, 245 Ill. 256, 91 N.E. 1056 (1910), a rule developed in this state which called for abstention in some cases.  This abstention or declination of jurisdiction was explained in 
Babcock
 as follows: "[T]he question is not strictly one of jurisdiction but rather of discretion in the exercise of jurisdiction.  ***  It is the inability of the court to do complete justice by its decree, and not its incompetency to decide the question involved, that determines the exercise of its power."  
Babcock
, 245 Ill. at 33-34, 91 N.E. at 690.  We note, however, that the Kennedy intervenors have not properly preserved for review the issue regarding the doctrine of abstention, due to their failure to properly argue and cite authority for that proposition.  See 188 Ill. 2d R. 341(e)(7).  Hence, it is waived.

Even if the Kennedy intervenors had properly raised this issue, they have failed to show how the circuit court abused its discretion in exercising jurisdiction and why the Illinois court is not able to do complete justice.  Professor Geoffrey C. Hazard, Jr., filed an affidavit that stated: "[V]arious [c]lass members here are also residents of Illinois.  See objector Schmetterer for example."  We also note that the Kennedy intervenors' statement that there were no deceptive practices claimed to have taken place in Illinois is without merit.  A review of the complaint shows otherwise.  As we previously stated, the complaint states that Ameritech and Indiana Bell are one unified corporate enterprise for purposes of the Illinois long-arm statute and that each of them acted on the other's behalf with the other's knowledge and/or consent.  The complaint also alleges that Ameritech, ASI, and Indiana Bell engaged in numerous unlawful schemes and courses of conduct that induced class members to pay for IWMS, and the complaint then lists 14 specific ways that each of them did so.  Additionally, Ameritech and ASI are Illinois defendants with headquarters in Illinois.  Hence, Ameritech's presence in Illinois clearly subjects them to suit in Illinois, and a party wishing to do so is well within his rights to do so.  We find no merit to the Kennedy intervenors' foregoing argument, because permitting Illinois defendants to be sued in Illinois will not make Illinois a "national haven for multistate 'pre[]packaged' class actions brought for settlement purposes only."

 [Nonpublishable text under Supreme Court Rule 23 

(166 Ill. 2d R. 23). Omitted here]

In light of the foregoing considerations, we affirm the circuit court's approval of the proposed class action settlement.

Affirmed.

KUEHN and HOPKINS, JJ., concur.

                                      

COMMENTS AND ANNOTATIONS
Text Box 1:

TEXT BOXES
NOTICE

Decision filed 01/15/02.  The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.