Docket No. 100555.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

SOLAIA TECHNOLOGY, LLC, *et al.*, Appellees, v. SPECIALTY PUBLISHING COMPANY *et al.*, Appellants.

*Opinion filed June 22, 2006.*

JUSTICE FITZGERALD delivered the judgment of the court, with opinion.

Justices McMorrow, Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

Chief Justice Thomas took no part in the decision.

Justice Freeman concurred in part and dissented in part, with opinion.

**OPINION**

The plaintiffs, Solaia Technology, LLC (Solaia Technology), the law firm of Niro, Scavone, Haller, & Niro, Ltd. (NSHN), and Raymond Niro, filed a defamation complaint against the defendants, Specialty Publishing Company, Peggy Smedley, John Buell, and John Doe. The circuit court of Cook County dismissed the complaint; the appellate court affirmed in part and reversed in part (357 Ill. App. 3d 1).

The central issue in this case is whether the so-called fair report privilege defeats the plaintiffs' allegations that the defendants made false statements with actual malice. The defendants argue it does; the plaintiffs argue it does not. The plaintiffs also request cross-relief, asserting that the appellate court erred in holding various statements made by the defendants were not defamatory. For the reasons that follow, we affirm in part, reverse in part, and remand.

## BACKGROUND

In 2001, Solaia Technology purchased United States Patent No. 5,038,318, commonly known as the '318 patent, from Schneider Automation, Inc. (Schneider Automation). The '318 patent relates to a system or standard for communicating real-time information between computers and machines. According to Solaia Technology, this standard is employed by virtually every company that uses a computer to control its manufacturing operation. Since purchasing the patent, Solaia Technology has aggressively enforced it, bringing infringement claims against various well-known companies. Solaia Technology has been represented in these suits by Niro and his firm, NSHN.

Specialty Publishing Company publishes Start magazine, whose target readership is manufacturing company executives. In an April 2002 article entitled "Chaos in Manufacturing," Start began its coverage of Solaia Technology's infringement claims.[1] Before discussing "patent attorneys pitting customers

---

[1]Though not all of Start's coverage of Solaia Technology's infringement claims is allegedly defamatory, we quote extensively from the three issues of Start mentioned in the plaintiffs' complaint in order to provide context for the statements at issue.

against suppliers," Start sketched the background of this litigation. According to Start, the "OPC Foundation" was founded in 1996 by a group of companies seeking to develop an "open standard" to provide "interoperabilty" between computers and machines used in manufacturing. The standard became very successful and was adopted by hundreds of companies:

> "Clearly, on the surface, the goal of [the OPC Foundation] was to enable the staunchest of competitors to play nice in the sandbox and develop an elusive open standard. In the end, an open standard would mean less expense for vendors and more solutions for users.
>
> Thus, came the birth of what is known as the OPC Foundation today. It all seemed so perfect. *** Sharing data and information that was once was [*sic*] proprietary. Innocent enough. And it was, in the beginning."

Start described what it termed "The legal entanglement":

> "So far, you should be asking yourself, what's the big deal? Until last year, there really wasn't any until a lawsuit was filed against [three] world-class manufacturers ***.
>
> Solaia Technology *** filed the lawsuit alleging that all three end user manufacturers are violating a patent that it purchased from Schneider Electric's Automation Business ***. Schneider sold the rights to its patent to Solaia between March and August of last year. Now Solaia, aided by the legal firm of Niro, Scavone, Haller & Niro, Chicago, Ill. is on a legal campaign targeting manufacturers who might be infringing on its patent."

Start then detailed Solaia Technology's infringement claims and offered comments on them from the OPC Foundation's attorney and Solaia Technology's attorney.

Under a subheadline "Baying for blood," Start continued:

> "Before we discuss who created this mess, we need to stipulate to a few points. As we stated earlier, this is an amazing [*sic*] irresistible story that deserves a lot of

coverage. It involves intrigue and lots of money. And the innocent companies who are being forced to defend themselves in this debacle–the victims whose fate is fueling the outrage–deserve a lot of sympathy. So how did this get so far out of line? Blame old-fashioned market mania, aided and abetted by deeply greedy people who wanted to make more money despite the costs. Without question, most of the frenzy is simply about money.

*** [T]here is certainly a lot of finger-pointing going on and no one wants to take responsibility for creating this legal nightmare. To really grasp the enormity of the problem, we will need to explore in detail each of the players and what they had hoped to accomplish.

The manufacturing mob is baying for blood, and many companies blame Schneider. In fact, just about everyone Start spoke with either on or off the record within the manufacturing community is furious over Schneider's initial actions. Their anger is only being fanned by Solaia's lawsuits against leading manufacturers."

Start summarized the history of the '318 patent and Schneider Automation's sale of it to Solaia Technology:

"Solaia Technology acquired the patent for an undisclosed amount. Although Solaia and its legal firm will not confirm or deny it, some companies are speculating the offer for the patent was based on a contingency bid. If this assessment is correct, Schneider would only be paid if Solaia wins its legal battle."

According to Start, "If Solaia proves victorious, it clearly intends to turn its sights on other prey." But "[a]ttorneys from Niro, Scavone, Haller & Niro reiterate that they are just following the law and that its clients should not be punished for taking advantage of the rules."

Start closed with a general comment on patent reform:

"It seems that new patents are issued monthly, if not weekly, granting more and more patents. Some argue that the U.S. Patent And [*sic*] Trademark Office is not

supposed to issue patents on ideas[;] however, many contend that is what it is doing with software patents. The end result is having a chilling effect on the software industry as more and more companies file lawsuits to defend these so-called patents.

\* \* \*

Watergate spawned campaign-finance reform, perhaps the Solaia lawsuits will spawn patent reform."

In August 2002, Start's cover announced, "The Chaos Deepens: Clorox Settles ... Others Are Sued." The cover and the accompanying article also featured a photocopy of the first page of Solaia Technology's patent infringement complaint against 16 well-known companies. Inside, Start noted that Clorox had settled with the "Solaia Technology LLC legal machine," but that more manufacturers "have been tossed into the legal fray as Solaia cast out a bigger net. \*\*\* If Solaia is successful in its legal carnage it could set the stage for many other manufacturers, both large and small, to be sued, or to be forced to pay Solaia royalty fees." In fact, Start reported, "[t]he legal nightmare deepens" for the 16 "world class manufacturers" named as defendants by Solaia Technology "just two days before Americans celebrated their independence." Start continued:

"Attorneys at Niro, Scavone, Haller & Niro strongly stress that this is just the beginning. Solaia's attorneys intend to continue to file suits against manufacturers they believe are infringing on patent '318. However, more and more manufacturers are publicly vowing to defend their positions in court.

\* \* \*

Although individual inventors have been selling their patents for quite some time, many observers are frustrated the patent system is being used as a vicious legal weapon to generate revenue."

Start repeated much of its coverage of Solaia Technology's infringement claims from the April 2002 issue. Schneider Automation sold the '318 patent to Solaia Technology; Solaia Technology then began enforcing it. Start noted that one of

Solaia Technology's attorneys and a member of NSHN denied any connection between Solaia Technology and Schneider Automation, but Start further noted that documents reveal "the relationship between these two companies might be more intimately linked." After reviewing these documents, Start continued:

> "Despite the devastating news that more manufacturers are being targeted, what makes this litigation even more disturbing is how it will impact the manufacturing industry as a whole.
>
> * * *
>
> Daniel Henderson, the president of Solaia Technology, aided by the legal firm of Niro, Scavone, Haller & Niro is on a legal campaign targeting manufacturers that might be infringing on its patent. Henderson and his legal machine have a war chest of many patent victories. Niro, Scavone, Haller & Niro intend to parlay these victories into more money for both its client and its law firm."

Start concluded:

> "For these *** manufacturers there is no escape. They are now embroiled in a legal battle that many insist can only harm the manufacturing industry, costing manufacturers millions.
>
> As industry observers, *Start* editors admit Solaia is hungry and will continue to target manufacturers. ***
>
> * * *
>
> In the end, no one wins and money prevails."

In a column titled "Exhibit 5," Start president and publisher Peggy Smedley questioned why "people, and perhaps companies," including Solaia Technology, are "so gung ho to sue these days." Smedley answered herself, "It's about money, pure and simple." She noted that the Clorox settlement with the "Solaia legal machine" has cast a cloud of pessimism over the industrial marketplace:

> "As we dig deeper into this case, we are uncovering information that points to a few disturbing facts about patent infringement cases. Namely, litigation in the

manufacturing industry has become a runaway train, fueled by lawyers and their clients hoping to cash in on patent infringement claims. *** It seems that corporations of all sizes and shapes are taking advantage of the patent law and exercising their legal right to defend their patents. Clearly, this has become a great new revenue source for many companies.

* * *

Niro, Scavone, Haller & Niro, attorneys for Solaia, reiterate that they are just following the law and its clients should not be punished for taking advantage of the rules. Perhaps they are right. I just can't help but feel sorry for these companies that are being forced to defend themselves.

* * *

While much information has been revealed in legal documents and briefs that have been filed in the court, still key details continue to be revealed. Speculation and concern about certain misdeeds are on the rise. Thus, we will continue to follow these cases as well as continue to investigate all the facts."

This issue of Start also contained a sidebar article entitled "More Than Just About Money," which sympathetically presented Niro's comments on patent litigation and the controversy surrounding Solaia Technology's infringement claims.

Many of the companies subject to these claims purchased the technology incorporating the '318 patent from Rockwell Automation, Inc. (Rockwell Automation), and these companies filed third-party claims against Rockwell Automation, alleging that it refused to indemnify them. According to Start, Rockwell Automation then filed a complaint in Illinois federal court against Solaia Technology, claiming that the '318 patent was invalid and that Solaia Technology's infringement claims constituted an unfair method of competition. Rockwell Automation asked the court to hear its case prior to hearing the third-party claims. The court evidently dismissed Rockwell Automation's complaint, but Rockwell pressed forward.

In December 2002, Rockwell Automation filed another complaint in Wisconsin federal court against Solaia Technology, NSHN, and Schneider Automation. In strong language, Rockwell Automation alleged that Solaia Technology, NSHN, and Schneider Automation, whom Rockwell Automation collectively labeled "the Conspirators," engaged in "concerted action" to extract money from its customers through a "bad-faith campaign" of "baseless and repetitive threats, allegations and suits *** in an apparent effort to 'shakedown' manufacturers." According to Rockwell Automation, the conspirators overstated "in a reckless and misleading fashion" the scope of the '318 patent that they sought to enforce in an effort to weaken Rockwell Automation and to garner "tens of millions in strike suit settlements." Rockwell Automation charged that Solaia Technology is a "front" or "shell" entity created for the sole purposes of holding the '318 patent and instituting litigation based on it. Rockwell Automation also charged that NSHN orchestrated this litigation scheme–from the sale of the '318 patent to the preparation of "false, misleading and threatening infringement letters" and later the filing of baseless and serial patent infringement claims. Rockwell Automation called this conduct "unlawful," and its complaint asserted that Solaia Technology, NSHN, and Schneider Automation violated, *inter alia*, section 1 of the Sherman Antitrust Act. See 15 U.S.C. §1 (2000). Rockwell Automation asked for compensatory damages, treble damages and attorney fees under the Clayton Act (15 U.S.C. §15(a) (2000)), punitive damages, and injunctive relief.

Start covered Rockwell Automation's move, and the Solaia Technology's infringement claims, in the January 2003 issue, the cover of which previewed, "CHAOS UPDATE: CONSPIRACY SHAKEDOWN." On a page titled "MAILCALL" and under the headline "SOLAIA MESS"[2] Start published an email containing "[t]houghts on the Solaia patent from an industry veteran who prefers to remain nameless." The industry veteran stated:

---

[2]It is unclear whether the headline "SOLAIA MESS" was provided by the unnamed author or by Start.

"There are a number of issues related to this mess that might appear mysterious.

First and foremost, if this patent is as valuable as has been suggested then why (a) did Schneider sell it to Solaia for $1 (plus a cut of the settlements) and why (b) did the hundreds of process control vendors who were notified that the patent was available decline to bid on it?

The answer is pretty clear if you actually read the patent.

*** [T]his is an extremely narrow patent.

*** [T]he reason why Schneider wanted to unload the patent and why none of the [other] existing control companies wanted to buy it was because the patent is essentially worthless.

Which brings us to the next question. If the patent is worthless then why is Solaia suing everyone and why are the manufacturers caving in? The answer to the first half is obvious. Why did Johnny Cochrane defend O.J.? Why was the Washington sniper killing people? Why did Enron and WorldCom cook the books? Because there are people in the world who want to make a lot of money and they don't care how they do it. Alas, there always have been and there always will be.

As for the second half, lets [*sic*] say you are walking home and you meet four large guys with baseball bats who claim that they own the street and want you to give them a $20 'toll' for using it. What do you do? *** [Y]ou might suggest that you and the guys with the bats appear before a competent court of law to discuss the matter. But, while the guys with the bats ostensibly agree to this, they also point out that in order to properly prepare for the trial it will be necessary for them to beat the crap out of you every day until the matter is decided (the legal term for this is 'discovery.') [*sic*] So even though you know you would win if you lived long enough to get to the courtroom, in the end you pay the $20

because its easier. As does the next guy and the guy after that.

Which brings me to the only thing I don't understand about this mess. Why do the end-user companies keep walking down that dark street alone? It seems to me that if all of the companies got together with their own bats and walked down the street as a group then, just maybe, the muggers would go find another street."

Start disclaimed these opinions, asserting that they do not necessarily represent those of the magazine or its readers.

An article titled "Conspiracy of a Shakedown" appeared later in the issue. This article began:

"As 2002 was coming to a close, Rockwell Automation was contemplating its next legal move with the intensity of a grand chess master at an international tournament. While it had been believed that Rockwell had been checkmated, and other manufacturers had been swept off the boards like so many sacrificial pawns, Rockwell was readying itself for its biggest move to date.

Rockwell *** turned the tables on Solaia Technology, *** Schneider Automation, *** and attorney Raymond Niro, Niro, Scavone, Haller & Niro, *** filing a lawsuit charging the aforementioned with unfair business practices.

On Dec. 10, 2002, Rockwell filed a lawsuit *** claiming that Solaia, Schneider, and Niro's law firm have conspired in violation of antitrust laws to 'shakedown' Rockwell's customers with baseless patent infringement claims.

When an Illinois Circuit Court Judge last year effectively dismissed Rockwell's attempt to intervene in the manufacturers' lawsuits, Rockwell decided to fight fire with fire."

Start then dissected Rockwell Automation's complaint:

"There are a couple of key points that appear to standout in the 29-page document. First, Rockwell claims that Niro, in conjunction with Solaia and

Schneider, 'have made and continue to make false and objectively-baseless claims of patent infringements against numerous manufacturers ***.'

Rockwell's suit charges that Solaia's lawsuits have made claims that have caused injury to Rockwell in its business and injury to competition in one or more markets for industrial automation systems.

But that's not all. In particular, as part of the plan to injure Rockwell and disrupt competition, the 'conspirators' have made, 'baseless threats and allegations against manufacturing entities that those manufacturers are infringing the '318 *** patent by, among other things, using [Rockwell] products; have overstated in a reckless and misleading fashion the scope, applicability and importance of the '318 patent to suppliers and users of industrial automation equipment in general; and have instituted repetitive, baseless, sham patent infringement litigation against those manufacturers.'

The legal document states that the defendants extract 'substantial sums' of money from Rockwell's customers through an ongoing bad-faith campaign to enforce and license patent '318.

* * *

In the end, Rockwell claims that Solaia, Schneider, and Niro have specifically targeted Rockwell customers to interfere with its relationship with both its actual and prospective customers.

* * *

Rockwell filed its complaint under federal antitrust laws: the Sherman Antitrust Act, the Clayton Act, and Lanham Act.

The Sherman Antitrust Act outlaws all contracts, combinations, and conspiracies that unreasonably restrain interstate and foreign trade. *** The Sherman Act also makes it a crime to monopolize or conspire with any other person or persons to monopolize any part of trade or commerce."

Start recapped its earlier coverage of "THE SAGA." According to Start, "To date, 20 world-class manufacturers have been the targets of this legal nightmare that has resulted in millions of dollars in settlements and legal fees. After the original settlements, Solaia continued its legal carnage, filing suit against 16 more manufacturers ***." Start noted that "[t]he ongoing legal battles between Solaia, Rockwell, and the manufacturers have been outlined in previous articles written by *Start* magazine." Start directed, "To read the history of the previous twists and turns in this legal entanglement, [April '02, Chaos in Manufacturing]," and also listed seven other prior issues containing features, updates, and editorials on "CHAOS IN MANUFACTURING."

Start then turned its attention to Niro. Under a subheadline "NIRO FIRES UP ROCKWELL," Start stated:

> "It could be said that Niro inspired Rockwell to make its most aggressive legal move to date. In fact, prior to Rockwell filing its lawsuit, Niro told *Start* that if Rockwell really wanted to intervene it better be committed all the way.
>
> Clearly, Rockwell's recent filing proves that it is committed. Rockwell admits that it will not acquiesce and will continue to fight for manufacturers.
>
> * * *
>
> Niro anticipates garnering total settlements in the range of $550 million to more than $600 million, before his company ends its legal rampage. Without Rockwell taking an aggressive stance to challenge the alleged patent infringement cases, some industry observers believe Niro would have run amuck suing even more manufacturers.
>
> Although actual numbers are confidential, Niro confirms that Solaia has already collectively secured millions of dollars in settlements. All of these settlements set the stage for hundreds, if not thousands, of other manufacturers to be sued before the patent expires at the end of the decade."

Start then provided its historical perspective on Solaia Technology's infringement claims:

> "To really grasp the enormity of this litigation, manufacturers need to understand what is at stake here.
>
> Solaia filed its lawsuits claiming that manufacturers are violating the patent that it purchased from Schneider Electric's Automation Business. Schneider sold the rights to its patent to Solaia between March and August 2001.
>
> In less than six months after obtaining the rights to the patent, Solaia had not only contacted manufacturers questioning their use of the technology based on the '318 patent, but filed a lawsuit in August.
>
> According to the Rockwell filing, 'Solaia Technology's single purpose is a "shell company["] formed to serve as the ["]front["] for baseless lawsuits on a Solaia patent previously owned by Schneider.'
>
> Since the original lawsuit was filed *** in 2001, rumors have been flying around about the relationship that exists between Solaia and Schneider.
>
> \* \* \*
>
> As more and more information is revealed, Rockwell believes it has enough proof to make its case that Schneider sold the patent rights because it was an easy way to 'monopolize' and target Rockwell customers."

Start noted that "Niro, lead attorney for Solaia, emphatically denies these claims and insists that he will fight back with all the legal fervour in his arsenal." Start quoted Niro:

> " 'I believe this is an act of desperation by Rockwell. It strikes me that since they are losing before the court at every turn, *** their frustration level must be so high that they are desperate enough to not only bring a lawsuit against our client and Schneider, but also against us.'
>
> \* \* \*

˘13˘

Niro explains the last time somebody tried a deal like this, involving one of his clients in naming him as a party, the case was not only dismissed, but there was an award of attorney fees.

\* \* \*

Forcefully Niro says, 'I think it's disgraceful. I have received comments from other attorneys, including attorneys who have represented some of the parties who have settled with us. They think it's disgraceful. I think it will speak for itself. Rockwell will ultimately pay the price for bringing a frivolous lawsuit.' "

On January 21, 2003, shortly after that issue of *Start* was published, Solaia Technology, NSHN, and Niro filed a complaint against Specialty Publishing Company, Smedley, John Buell, the editor of Start, and "John Doe," the unnamed industry veteran who wrote the letter in the January 2003 issue of Start. The plaintiffs alleged, *inter alia*, that certain false statements in Start's April 2002, August 2002, and January 2003 issues constituted defamation *per se*. Regarding the April 2002 issue, the plaintiffs challenged the references to "innocent companies," "deeply greedy people," and "so-called patents." Regarding the August 2002 issue, the plaintiffs challenged the references to patent litigation as a "runaway train, fueled by lawyers and their clients hoping to cash in," rising "speculation and concern about certain misdeeds" by the plaintiffs, and Solaia Technology's "legal carnage."

Regarding the January 2003 issue, the plaintiffs challenged the cover headline, "CHAOS UPDATE: CONSPIRACY SHAKEDOWN," the cover story headline, "Conspiracy of a Shakedown," as well as the references to Rockwell Automation's charging Niro personally with unfair business practices and to the Sherman Antitrust Act criminalizing monopolies. The plaintiffs also attacked references in the industry veteran's letter, labeling Solaia's patent "essentially worthless" and likening the plaintiffs to "people in the world who want to make a lot of money and \*\*\* don't care how they do it," such as O.J. Simpson's criminal defense attorney Johnny Cochrane, Enron and WorldCom executives charged with various financial improprieties, the Washington, D.C.,

sniper, and later to a group of muggers armed with baseball bats.

On February 20, 2003, the defendants filed a combined motion to dismiss the plaintiffs' complaint (735 ILCS 5/2–619.1 (West 2002)), arguing that these statements were not defamatory and that some of them were privileged. On May 21, 2003, the trial court dismissed the plaintiffs' complaint, concluding that each of the challenged statements was either subject to an innocent construction, protected as an expression of opinion, or privileged as "a fair abridgment of the litigation." The trial court even stated, "The language used and allegations made in the Rockwell lawsuit are considerably more aggressive than Start's report of the complaint." The plaintiffs then filed an amended complaint, which the trial court dismissed with prejudice. The plaintiffs appealed.

A divided appellate court affirmed in part, reversed in part, and remanded. 357 Ill. App. 3d 1. The appellate court cataloged the statements in Start's coverage of the Solaia Technology litigation that, according to the plaintiffs, constituted defamation *per se*. The appellate court held that Start's statement in April 2002 that "innocent companies" have been forced to defend themselves against Solaia Technology's infringement claims is capable of an innocent construction: "[I]t is clear that the phrase 'innocent companies' is referring not to plaintiffs here, but to the companies that integrated what they thought was a nonproprietary standard into their business before it was revealed that a patent was owned on technology that had been incorporated into the standard." 357 Ill. App. 3d 1 (contained in material unpublished under Supreme Court Rule 23). With respect to Start's statements that "deeply greedy people" created the mess of Solaia Technology's infringement claims, and that "speculation and concern about certain misdeeds are on the rise," the appellate court again held that they are capable of an innocent construction. 357 Ill. App. 3d 1 (contained in material unpublished under Supreme Court Rule 23). According to the court, the deeply greedy people whose misdeeds have spurred concern could be Schneider Automation, its officers, the officers of other companies filing infringement claims, or the lawyers who

represent these other companies. 357 Ill. App. 3d 1 (contained in material unpublished under Supreme Court Rule 23). With respect to the industry veteran's letter, the appellate court held that it was an expression of opinion and therefore not actionable. 357 Ill. App. 3d 1 (contained in material unpublished under Supreme Court Rule 23). The appellate court also held that Start's statements regarding the Sherman Act were not actionable because they were not false. 357 Ill. App. 3d 1 (contained in material unpublished under Supreme Court Rule 23).

The court then turned to the January 2003 cover article, "Conspiracy of a Shakedown." The court reviewed the common law fair report privilege and section 611 of the first and second Restatements of Torts. 357 Ill. App. 3d at 7-8. Relying upon *Newell v. Field Enterprises, Inc.*, 91 Ill. App. 3d 735 (1980), the appellate court concluded that the fair report privilege attaches when the complaint reported is filed. 357 Ill. App. 3d at 11. The appellate court determined that the title was an accurate summary of Rockwell Automation's complaint, which contained express allegations that Solaia Technology and NSHN engaged in a shakedown scheme. 357 Ill. App. 3d at 8. The court further determined that the title was fair because it did not refer to Solaia Technology or NSHN:

> "[T]here is nothing misplaced or omitted in the headline of the article that would convey the impression that Solaia or its law firm engaged in a 'Conspiracy of a Shakedown' to those who read it, and, accordingly, we find that the headline was a fair abridgment of the proceedings. *** [T]he remaining issue to be decided in this case is whether Illinois law still allows allegations of actual malice to defeat any claim of protection by the fair report privilege." 357 Ill. App. 3d at 9-10.

The appellate court reviewed *Catalano v. Pechous*, 83 Ill. 2d 146 (1980), and noted that, since *Catalano*, there has been a divergence of authority on this issue:

> "An examination of the *Catalano* decision reveals that it is ultimately unclear as to whether the supreme court chose to adopt section 611 of the Restatement (Second) of Torts because the court never expressly so

˘16˘

stated. However, regardless of whether our supreme court adopted the Restatement (Second) of Torts' approach, we read *Catalano* as holding that allegations of actual malice defeat the privilege set forth in section 611, *i.e.*, the fair report privilege." 357 Ill. App. 3d at 14. The appellate court stated that the plaintiffs had adequately pleaded actual malice. 357 Ill. App. 3d at 15. Accordingly, the trial court erred in finding that the title "Conspiracy of a Shakedown" did not support a claim for defamation. 357 Ill. App. 3d at 15.

Finally, the appellate court addressed the plaintiffs' argument that the "overriding point" of Start's coverage of the Solaia Technology's patent claims was defamatory. The court stated that except for the headline "Conspiracy of a Shakedown," none of the challenged statements were individually defamatory *per se*, and it consequently rejected the plaintiffs' contention that their sum was defamatory. 357 Ill. App. 3d 1 (contained in material unpublished under Supreme Court Rule 23).

Justice Cahill wrote a special concurrence, in which he agreed with the result, but stated that he would not have addressed the fair report privilege with respect to the headline "Conspiracy of a Shakedown." 357 Ill. App. 3d at 16 (Cahill, J., specially concurring). According to Justice Cahill,

"There is nothing in the text of the headline that would leave the reader with an impression that the underlying article reports on a complaint alleging unfair business practices and conspiracy. Without reference to the official proceeding, the reader is left with only one conclusion: plaintiffs entered into an illegal conspiracy. *** The headline in this case is known as a 'catcher' or 'eye-stopper' in the media trade. Though sometimes misleading, such headlines carry the reputational weight, for whatever it is worth, of the media outlet. That is why the headline in this case, if run in a newspaper or magazine with no axe to grind, would have read 'Conspiracy of a Shakedown, Complaint Alleges.' It is of little solace to plaintiffs that their names are not identified in the headline or that the reader later learns

that the allegation comes from a privileged legal document." 357 Ill. App. 3d at 16 (Cahill, J., specially concurring).

We allowed the defendants' petition for leave to appeal. 177 Ill. 2d R. 315(a). We then allowed the Illinois Press Association, the Chicago Tribune Company, the Copley Press, Inc., and the Chicago Reader, Inc., to file an *amicus curiae* brief in support of the defendants. 155 Ill. 2d R. 345.

ANALYSIS

A motion to dismiss under section 2–615(a) of the Code of Civil Procedure (735 ILCS 5/2–615(a) (West 2002)) tests the legal sufficiency of a plaintiff's claim; a motion to dismiss under section 2–619(a) (735 ILCS 5/2-619(a) (West 2000)) admits the legal sufficiency of the plaintiff's claim, but asserts certain defects or defenses outside the pleading that defeat the claim. See *Provenzale v. Forister*, 318 Ill. App. 3d 869, 878 (2001). Under either section, our standard of review is *de novo*. See *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116 (1993).

In this appeal, the defendants argue that the appellate court erred in holding that the fair report privilege could be trumped by an allegation of actual malice. The plaintiffs respond that the appellate court did not err in this regard, but it did err in holding that the privilege applied at all because the defendant's statements were not a fair abridgement of the Rockwell Automation antitrust complaint. In their request for cross-relief, the plaintiffs also argue that the appellate court erred in holding that various statements in the January 2003 issue of Start were not defamatory.

To state a defamation claim, a plaintiff must present facts showing that the defendant made a false statement about the plaintiff, the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages. *Krasinski v. United Parcel Service, Inc.*, 124 Ill. 2d 483, 490 (1988), citing Restatement (Second) of Torts §558 (1977). A defamatory statement is a statement that harms a person's reputation to the extent it lowers the person in the eyes of the community or deters the community from

˘18˘

associating with her or him. *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 10 (1992), citing Restatement (Second) of Torts §559 (1977). A statement is defamatory *per se* if its harm is obvious and apparent on its face. *Owen v. Carr*, 113 Ill. 2d 273, 277 (1986). In Illinois, there are five categories of statements that are considered defamatory *per se*: (1) words that impute a person has committed a crime; (2) words that impute a person is infected with a loathsome communicable disease; (3) words that impute a person is unable to perform or lacks integrity in performing her or his employment duties; (4) words that impute a person lacks ability or otherwise prejudices that person in her or his profession; and (5) words that impute a person has engaged in adultery or fornication. *Van Horne v. Muller*, 185 Ill. 2d 299, 307 (1998), citing *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 88-89 (1996).

However, a statement that is defamatory *per se* is not actionable if it is reasonably capable of an innocent construction. *Bryson*, 174 Ill. 2d at 90. The so-called "innocent-construction rule" requires a court to consider the statement in context and to give the words of the statement, and any implications arising from them, their natural and obvious meaning. *Kolegas*, 154 Ill. 2d at 11; *John v. Tribune Co.*, 24 Ill. 2d 437, 442 (1962). "[I]f, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se*." *Chapski v. The Copley Press*, 92 Ill. 2d 344, 352 (1982). "[A] statement 'reasonably' capable of a nondefamatory interpretation, given its verbal or literary context, should be so interpreted. There is no balancing of reasonable constructions ***." *Mittelman v. Witous*, 135 Ill. 2d 220, 232 (1989). That is, a court must interpret the words of the statement "as they appear[ ] to have been used and according to the idea they were intended to convey to the reasonable reader." *Bryson*, 174 Ill. 2d at 93, citing 33A Ill. L. & Prac. *Slander & Libel* §12, at 25 (1970). When the defendant clearly intended and unmistakably conveyed a defamatory meaning, a court should not strain to see an inoffensive gloss on the statement. *Bryson*, 174 Ill. 2d at 93; *Chapski*, 92 Ill. 2d at 350-51.

Additionally, if a statement is defamatory *per se*, but not subject to an innocent construction, it still may enjoy constitutional protection as an expression of opinion. "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40, 41 L. Ed. 2d 789, 805, 94 S. Ct. 2997, 3007 (1974). However, there is no artificial distinction between opinion and fact: a false assertion of fact can be defamatory even when couched within apparent opinion or rhetorical hyperbole. *Bryson*, 174 Ill. 2d at 99-100, citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19, 111 L. Ed. 2d 1, 17-18, 110 S. Ct. 2695, 2705-06 (1990); *Dubinsky v. United Airlines Master Executive Council*, 303 Ill. App. 3d 317, 324 (1999) ("expressions of opinion may often imply an assertion of objective fact and, in such cases, would be considered actionable"). Indeed, "[i]t is well established that statements made in the form of insinuation, allusion, irony, or question, may be considered as defamatory as positive and direct assertions of fact." *Berkos v. National Broadcasting Co.*, 161 Ill. App. 3d 476, 487 (1987). Similarly, "[a] defendant cannot escape liability for defamatory factual assertions simply by claiming that the statements were a form of ridicule, humor or sarcasm." *Kolegas*, 154 Ill. 2d at 16. The test is restrictive: a defamatory statement is constitutionally protected only if it cannot be reasonably interpreted as stating actual fact. *Kolegas*, 154 Ill. 2d at 14-15. Several considerations aid our analysis: whether the statement has a precise and readily understood meaning; whether the statement is verifiable; and whether the statement's literary or social context signals that it has factual content. See *Mittelman*, 135 Ill. 2d at 243; *Hopewell v. Vitullo*, 299 Ill. App. 3d 513, 518-19 (1998); see generally *Bryson*, 174 Ill. 2d at 100-01; Restatement (Second) of Torts §566 (1977). If a statement is factual, and it is false, it is actionable.

The plaintiffs list several statements from the January 2003 issue of Start which they contend are defamatory *per se*: the cover headline "CHAOS UPDATE: CONSPIRACY

SHAKEDOWN"; the reference in the cover article "Conspiracy of a Shakedown" to the Sherman Act's criminal provisions; the assertion in that article that Rockwell Automation sued Niro personally; the reference in that article to earlier issues of Start covering the Solaia Technology litigation, particularly the statement in the April 2002 issue of Start that "innocent companies" have been forced to defend themselves from "deeply greedy people"; and the industry veteran's letter, particularly the comment that the '318 patent was "essentially worthless" and was being used to coerce settlements. Two of these statements–the reference to earlier articles and the comment in the industry veteran's letter–do not concern Rockwell Automation's antitrust complaint. We will address these statements first, then address the other statements and the fair report privilege.

The plaintiffs contend the reference to earlier articles was defamatory because the earlier articles contained false statements that the plaintiffs were using unfounded claims to exact settlements. The plaintiffs specify that in the April 2002 article "Chaos in Manufacturing," Start announced that "innocent companies" are being forced to defend themselves from "deeply greedy people." The appellate court found an innocent construction to this statement: "innocent companies" did not refer to the plaintiffs, and "deeply greedy people" could refer to Schneider Automation, its officers, its attorneys, or other companies filing infringement claims and their attorneys.

We find the appellate court's reasoning unconvincing. Certainly, "innocent companies" does not refer to the plaintiffs, but the natural and obvious implication of the entire passage "the innocent companies who are being forced to defend themselves in this debacle–the victims whose fate is fueling the outrage–deserve a lot of sympathy" is that less-than-innocent, less-than-sympathetic parties are victimizing them. Start quickly identified these parties: "deeply greedy people" who aid and abet "market mania." According to Start, "there is certainly a lot of finger-pointing going on and no one wants to take responsibility for creating this legal nightmare." In an effort to place responsibility, Start then attempted "to explore in detail

each of the players and what they had hoped to accomplished," noting in preface that "many companies blame Schneider" and that "[t]heir anger is only being fanned by Solaia's lawsuits." Later in this article, Start stated that "[i]f Solaia proves victorious, it clearly intends to turn its sights on other prey."

There is simply no innocent construction for this statement. The defendants characterized the plaintiffs as deeply greedy people, responsible for a legal nightmare, as well as industrywide anger with patent enforcement lawsuits against an increasing number of prey. This statement clearly impugns the plaintiffs' integrity and thus falls within one of the recognized categories of defamation *per se.* But it also falls within the bounds of constitutionally protected opinion. The phrase "deeply greedy people" has no precise meaning, and it is not verifiable. Further, the context in which that phrase appeared indicates that it may have been judgmental, but it was not factual. This statement is not actionable.

The plaintiffs also contend that the comment in the industry veteran's letter was defamatory. See *Barrett v. Fonorow*, 343 Ill. App. 3d 1184, 1192 (2003) (noting that a newspaper may be liable if a letter to the editor that it publishes contains a defamatory statement), quoting J. Friedman & F. Buono, *Limiting Tort Liability for Online Third-Party Content Under Section 230 of the Communications Act*, 52 Fed. Comm. L.J. 647, 650-51 (2000); see generally 50 Am. Jur. 2d *Libel & Slander* §256, at 517 (1995). The plaintiffs focus upon the statement that the '318 patent was "essentially worthless" and being used to generate settlement proceeds. The appellate court held that this statement falls within the bounds of constitutionally protected opinion.

Again, we disagree with the appellate court. Though the phrase "essentially worthless" has no precise meaning in the abstract, it has a very precise meaning in the context of the letter. The industry veteran asked why Schneider Automation sold the '318 patent to Solaia Technology for $1 "plus a cut of the settlements," while other companies declined to bid on it. The industry veteran then stated, "The answer is pretty clear if

you actually read the patent," to wit: "this is an extremely narrow patent." According to the industry veteran, "the reason why Schneider wanted to unload the patent and why none of the [other] existing control companies wanted to buy it was because the patent is essentially worthless." Thus, the letter not only places a value on the patent, but bases this value on an informed reading of the patent by the industry veteran. The letter accuses the plaintiffs of filing infringement claims, obviously, "to make a lot of money," regardless of the means, then compares their tactics to those of muggers armed with baseball bats.

The letter undoubtedly employs hyperbole, but this statement is not an opinion. Under its metaphorical chaff hides a kernel of fact: Solaia Technology secured a worthless patent and filed infringement claims with the sole aim of extracting settlements. See *Kumaran v. Brotman*, 247 Ill. App. 3d 216, 228 (1993) (holding that a newspaper article suggesting the plaintiff was "working a scam" by filing "frequent, unwarranted lawsuits to procure pecuniary settlements" was not an opinion and thus actionable). The statement directly impugns the plaintiffs' integrity by questioning the validity of the patent and consequently the validity of Solaia Technology's infringement claims, and thus falls within one of the recognized categories of defamation *per se*. We now turn to the remaining allegedly defamatory statements, all of which concern Rockwell Automation's antitrust complaint, and thus implicate the fair report privilege.

A defamatory statement is not actionable if it is privileged; this is a question of law. See *Layne v. Builders Plumbing Supply Co.*, 210 Ill. App. 3d 966, 969 (1991). There are two classes of privileged statements: those subject to an absolute privilege, and those subject to a conditional or qualified privilege. See *Joseph v. Collis*, 272 Ill. App. 3d 200, 210 (1995). The fair report privilege is a qualified privilege, which promotes our system of self-governance by serving the public's interest in official proceedings, including judicial proceedings. See *Newell*, 91 Ill. App. 3d at 744-45, citing *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491-92, 43 L. Ed. 2d 328, 347, 95

S. Ct. 1029, 1044-45 (1975). Section 611 of the second Restatement of Torts provides: "The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported." Restatement (Second) of Torts §611 (1977). The parties dispute whether this privilege can be defeated by allegations of actual malice.[3]

More than 20 years ago, the Seventh Circuit Court of Appeals noted, "Illinois law is in disarray on the question whether actual malice defeats the privilege of fair summary." *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 272 (7th Cir. 1983). In *Lulay v. Peoria Journal-Star, Inc.*, 34 Ill. 2d 112 (1966), we stated that section 611 of the first Restatement of Torts "definitely expresses the prevailing, if not unanimous, weight of judicial authority." *Lulay*, 34 Ill. 2d at 115. Following that section, we held that the media enjoys a privilege to report a defamatory statement made in a government proceeding if the report is an accurate and complete rendition or a fair abridgement of the proceedings, and the report was not motivated by common law malice–it was not "conceived or inspired solely because of a malicious design to injure the plaintiff or his business." *Lulay*, 34 Ill. 2d at 115-16.

---

[3]As the defendants note, the term "actual malice" means "constitutional malice," as described in *New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964). Actual or constitutional malice–subjective awareness of the falsity or probable falsity of a statement–is distinguishable from common law malice–ill will or intent to harm. See *Hustler Magazine v. Falwell*, 485 U.S. 46, 53, 99 L. Ed. 2d 41, 50, 108 S. Ct. 876, 880-81 (1988).

In *Catalano*, we discussed *Lulay*, the first Restatement, and the rule that the fair report privilege was "defeasible if the statement was made with malice, in the common law sense of the term," *i.e.*, the statement was intended to cause harm. *Catalano*, 83 Ill. 2d at 167. We then noted, "When *Lulay* was decided that limitation had of course been rendered obsolete by *New York Times v. Sullivan*." *Catalano*, 83 Ill. 2d at 167. We then quoted the second Restatement's version of section 611, in effect adopting it as our rule. *Catalano*, 83 Ill. 2d at 168.

The plaintiffs in *Catalano* did not argue that the report was not accurate or fair. Instead, they argued that the fair report privilege was inapplicable because the reporter did not hear the defamatory statement at a governmental proceeding, but only as later paraphrased by a government official. "These points," we stated, "raise questions not addressed in *Lulay*" and the fair report privilege. *Catalano*, 83 Ill. 2d at 168. We held that the plaintiffs did not show actual malice by the media defendants in republishing the government official's account of the proceeding, as required by *New York Times v. Sullivan*. *Catalano*, 83 Ill. 2d at 168, citing Restatement (Second) of Torts §578 (1977). We did not incorporate actual malice into the fair report privilege. See *Tepper v. Copley Press, Inc.*, 308 Ill. App. 3d 713, 719 (1999); see also *Hurst v. Capital Cities Media, Inc.*, 323 Ill. App. 3d 812, 817-18 (2001). In fact, the first amendment itself prevents actual malice from defeating the privilege. See *Gist v. Macon County Sheriff's Department*, 284 Ill. App. 3d 367, 376 (1996), citing *Cohn*, 420 U.S. 469, 43 L. Ed. 2d 328, 95 S. Ct. 1029.

We hold that the fair report privilege overcomes allegations of either common law or actual malice. As comment *a* to section 611 explains,

> "The basis of this privilege is the interest of the public in having information made available to it as to what occurs in official proceedings and public meetings. *** [T]he privilege exists even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false. Abuse of the privilege takes place, therefore, when the

publisher does not give a fair and accurate report of the proceeding." Restatement (Second) of Torts §611, Comment *a*, at 297-98 (1977).

Comment *b* states that the Constitution requires a defamation plaintiff show that the defendant was at fault. Restatement (Second) of Torts §611, Comment *b*, at 298 (1977). The fair report privilege in section 611 permits a defendant to publish a report of an official proceeding even though the defendant knows the report contains a false and defamatory statement. Restatement (Second) of Torts §611, Comment *b*, at 298 (1977). Accordingly, "[t]he constitutional requirement of fault is met in this situation by a showing of fault in failing to do what is reasonably necessary to insure that the report is accurate and complete or a fair abridgment. *** If the report of a public official proceeding is accurate or a fair abridgment, an action cannot constitutionally be maintained." Restatement (Second) of Torts §611, Comment *b*, at 298 (1977).

Thus, the fair report privilege has two requirements: (1) the report must be of an official proceeding; and (2) the report must be complete and accurate or a fair abridgement of the official proceeding. Here, the parties dispute whether Rockwell Automation's antitrust complaint itself is sufficient to satisfy the first requirement.

Comment *d* to section 611 states that the fair report privilege extends to the report of any official proceeding, including proceedings before any court. Restatement (Second) of Torts §611, Comment *d*, at 299 (1977). However,

> "[a] report of a judicial proceeding implies that some official action has been taken by the officer or body whose proceedings are thus reported. The publication, therefore, of the contents of preliminary pleadings[,] such as a complaint or petition, before any judicial action has been taken is not within the rule stated in this Section. An important reason for this position has been to prevent implementation of a scheme to file a complaint for the purpose of establishing a privilege to publicize its content and then dropping the action."

Restatement (Second) of Torts §611, Comment *e*, at 300 (1977).

Comment *c* makes this clear:

"A person cannot confer this privilege upon himself by making the original defamatory publication himself and then reporting to other people what he had stated. *** Nor may he confer the privilege upon a third person, even a member of the communications media, by making the original statement under a collusive arrangement with that person for the purpose of conferring the privilege upon him." Restatement (Second) of Torts §611, Comment *c*, at 299 (1977).

In 1980, Illinois joined a growing trend, declining to place a judicial-action limitation on the privilege. In *Newell*, the appellate court weighed the arguments in favor of the majority view that the privilege does not attach until judicial action has occurred and the minority view that the privilege attaches when the complaint is filed. *Newell*, 91 Ill. App. 3d at 745-46. The court mentioned that the Seventh Circuit Court of Appeals decided Illinois courts would adopt the minority view. *Newell*, 91 Ill. App. 3d at 746, citing *American District Telegraph Co. v. Brink's Inc.*, 380 F.2d 131 (7th Cir. 1967). The appellate court agreed, offering four distinct reasons. First, the filing of a complaint is itself a public act. *Newell*, 91 Ill. App. 3d at 748. Second, the privilege serves the public's interest in the judicial system, and this interest begins with the filing of a complaint. *Newell*, 91 Ill. App. 3d at 746. Third, a judicial-action limitation on the privilege would purportedly decrease the risk of publishing scurrilous pleadings, but this limitation is ineffective: "Simply because a suit has proceeded to the point where judicial action of some kind has taken place does not necessarily mean that the suit is less likely to be groundless and brought in bad faith." *Newell*, 91 Ill. App. 3d at 747. Fourth, the public has a sophisticated understanding of the court system and is capable of evaluating information gleaned from a complaint. *Newell*, 91 Ill. App. 3d at 747-48.

Though we have not previously noted our concurrence with *Newell*, we do so now. We hold that there is no judicial-action

ˇ27ˇ

limitation on the fair report privilege in Illinois. Once Rockwell Automation filed its antitrust complaint, Start could report any defamatory statements in the complaint, provided it met the second requirement of the fair report privilege.

Start's coverage of the Rockwell Automation case was not a complete and accurate rendering of a complaint, so we must determine whether it was a fair abridgement. *Gist*, 284 Ill. App. 3d at 377 ("one must either make a complete and accurate report, or, if a summary is made, the summary must be 'fair' for the privilege to apply"). A fair abridgment means that the report must convey to readers " 'a substantially correct account.' " *Tepper*, 308 Ill. App. 3d at 720, quoting Restatement (Second) of Torts §611, Comment *f*, at 300 (1977). Comment *f* of the second Restatement observes:

> "[I]t is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it ***. The reporter is not privileged under this Section to make additions of his own that would convey a defamatory impression, nor to impute corrupt motives to any one, nor to indict expressly or by innuendo the veracity or integrity of any of the parties." Restatement (Second) of Torts §611, Comment *f*, at 300-01 (1977).

In this regard, a court must determine if the sting of the defamatory statement in the proceeding is the same as the sting of the defamatory statement in the report. See *Myers v. The Telegraph*, 332 Ill. App. 3d 917, 923 (2002). If so, the privilege defeats the defamation claim because the accuracy of the summary is the "benchmark of the privilege"; the report is the public's window to the proceeding. *Gist*, 284 Ill. App. 3d at 376, citing Restatement (Second) of Torts §611, Comment *i*, at 301 (1977); accord *Maple Lanes, Inc. v. News Media Corp.*, 322 Ill. App. 3d 842, 844 (2001), citing *Dolatowski v. Life Printing & Publishing Co.*, 197 Ill. App. 3d 23, 27 (1990); see also *Newell*, 91 Ill. App. 3d at 749.[4]

---

[4]The appellate court stated that the "sting" issue was forfeited because the plaintiffs did not raise it until their reply brief. 357 Ill. App. 3d at 15,

citing *Todt v. Ameritech Corp.*, 327 Ill. App. 3d 359, 369 (2002). In their response brief below, the defendants argued that the sting of the "Conspiracy of a Shakedown" article came from Rockwell Automation's antitrust complaint. The plaintiffs were entitled to counter. See 188 Ill. 2d R. 341(g); *Lieb v. Judges' Retirement System of Illinois*, 314 Ill. App. 3d 87, 96 (2000) ("Portions of a reply brief will not be stricken if the arguments respond to arguments made in the appellee brief").

We note that the defendants filed a combined motion to dismiss, arguing in the alternative that the statements challenged by the plaintiffs were not defamatory and that any defamatory statements in the January 2003 issue fell within the fair report privilege. Thus, with respect to the remaining statements, we first must determine whether they were defamatory. If they were, we then must determine whether the fair report privilege applies, *i.e.*, whether the statements were a fair abridgement of Rockwell Automation's antitrust complaint.

Start's January 2003 cover headline "CHAOS UPDATE: CONSPIRACY SHAKEDOWN" and its cover story headline "Conspiracy of a Shakedown" were not defamatory. As the appellate court correctly observed, these headlines do not directly refer to the plaintiffs. Nothing in the headlines leaves the implication that the plaintiffs were involved in a conspiracy or a shakedown. Even if we were to accept the argument made in Justice Cahill's concurrence and adopted by the plaintiffs that the headlines were defamatory, they were a fair abridgement of Rockwell Automation's antitrust complaint. "CHAOS UPDATE" was a cue to Start's readers that an article in this issue would contain an update on the "Chaos in Manufacturing" article from April 2002, as well as "The Chaos Deepens" article from August 2002. "CONSPIRACY SHAKEDOWN" and "Conspiracy of a Shakedown" simply borrow words from Rockwell Automation's complaint. According to the defendants, Rockwell Automation used a form of the word "conspiracy" 25 times and the word "shakedown" three times in its complaint. The headlines do not identify the plaintiffs as conspirators, and read together with the article (see *Harrison v. Chicago Sun-Times, Inc.*, 341 Ill. App. 3d 555, 570 (2003)), the headlines simply announce Start's coverage of Rockwell Automation's complaint.

The statement in the "Conspiracy of a Shakedown" article that Rockwell Automation sued Niro personally, charging him with unfair business practices, impugned his integrity, prejudiced his practice of law, and implied that he committed a crime. It thus falls within several of the recognized categories of defamation *per se.* See *Hoeflicker v. Higginsville Advance,*

˘30˘

*Inc.*, 818 S.W.2d 650, 652-53 (Mo. Ct. App. 1991); see also *Weber v. Lancaster Newspapers, Inc.*, 2005 PA Super. 192, ¶¶29-34, 878 A.2d 63, 73-74. Further, this statement was not a fair abridgement. It was baldly inaccurate. Even though Start corrected its error in the very next sentence, Start perpetuated this error throughout the article. In presenting "key points" from Rockwell Automation's complaint, Start quoted part of the complaint's first paragraph and stated: "Rockwell claims that Niro, in conjunction with Solaia and Schneider, 'have made and continue to make false and objectively-baseless claims of patent infringements against numerous manufacturers.'" Rockwell Automation's complaint used "Defendants," rather than "Niro, in conjunction with Solaia and Schneider." Start later stated, "In the end, Rockwell claims that Solaia, Schneider, and Niro have specifically targeted Rockwell customers to interfere with its relationship with both its actual and prospective customers."[5]

Finally, in describing how Niro personally inspired Rockwell Automation to file its complaint, Start stated, "Niro anticipates garnering total settlements in the range of $550 million to more than $600 million, before *his company* ends its legal rampage." (Emphasis added.) Perhaps Start was referring to Niro's limited

---

[5]We note that in paragraph 38 of Rockwell Automation's antitrust complaint, Rockwell Automation stated, "Solaia and Niro identified Rockwell products as the basis for their infringement claims." The defendants have not brought this passage to our attention, but it does not change our conclusion. This passage does not mean that Rockwell Automation sued Niro personally, and it is likely that Niro, as a named partner of the firm representing Solaia Technology, advised his client about which companies may have infringed on the '318 patent.

liability company, NSHN, and not NSHN's client, Solaia Technology, but elsewhere in the article, Start used "Niro's firm," not Niro's company. Start's statement regarding Niro was not a fair abridgement of Rockwell Automation's complaint, and the fair report privilege does not apply. Accordingly, the plaintiffs' allegations regarding this statement survive.

Finally, the statement regarding the Sherman Antitrust Act was defamatory. In its "Conspiracy of a Shakedown" article, Start outlined Rockwell Automation's complaint and stated, "Rockwell filed its complaint under federal antitrust laws: the Sherman Antitrust Act, the Clayton Act, and Lanham Act." Start then added, "The Sherman Antitrust Act outlaws all contracts, combinations, and conspiracies that unreasonably restrain interstate and foreign trade. *** *The Sherman Act also makes it a crime to monopolize or conspire with any person or persons to monopolize any part of trade or commerce.*" (Emphasis added.) The appellate court correctly characterized the statement as substantially true, but the plaintiffs did not challenge the veracity of this statement standing alone. Instead, they challenged the veracity of the implication left by the statement, namely, they had committed a crime.

Rockwell Automation's civil antitrust complaint did not charge the plaintiffs with a crime. According to Rockwell Automation, Solaia Technology, NSHN, and Schneider Automation violated section 1 of the Sherman Antitrust Act by contracting, combining, or conspiring to restrain trade in the '318 patent, thus injuring competition and Rockwell Automation. Rockwell alleged that the plaintiffs threatened, instituted, and perpetuated a series of objectively baseless infringement claims for financial gain, namely, pretrial settlements. Rockwell Automation did not mention any criminal proceedings. In fact, enforcement of section 1 of the Sherman Antitrust Act is left to the United States Attorney (see 15 U.S.C. §4 (2000)), and there is no indication in the record that such proceedings against the plaintiffs were ever contemplated.

There is no innocent construction for this statement. The natural and obvious implication of this statement is that the plaintiffs committed a crime. The defendants assert that this

statement was "a summary for manufacturing company executives who constitute Start's readership of the basic provisions of the federal antitrust laws," but they offer no explanation why this summary did not include references to other provisions more relevant to Rockwell Automation's complaint, *e.g.*, section 15(a) of the Clayton Act, which provides a private remedy for violations of the Sherman Antitrust Act. See 15 U.S.C. §15(a) (2000) (any person who shall be "injured [in his] business or property by reason of anything forbidden in the antitrust laws *** may sue" and recover treble damages, interest, costs, and attorney fees). Indeed, it is difficult to fathom why Start would make a gratuitous reference to the criminality of conduct violating the Sherman Antitrust Act after it had just noted that the statute "outlaws" such conduct.

Start's statement regarding the Sherman Act implied that the plaintiffs committed a crime, particularly when read with the background of Start's other coverage of Solaia Technology's infringement claims.,[6] It thus falls within one of the recognized

---

[6]In April 2002 Start created a narrative of innocent corporate victims deserving sympathy against deeply greedy people who "aid and abet" maniacal markets, namely, Schneider Automation and Solaia Technology, as well as "Solaia's legal machine," Niro and NSHN. "Aid and abet" means "assist or facilitate the commission of a crime, or *** promote its accomplishment." See Black's Law Dictionary 76 (8th ed. 2004); see also 720 ILCS 5/5‑2(c) (West 2002) ("A person is legally accountable for the conduct of another when *** he *** aids, abets, agrees or attempts to aid, such other person in the planning or commission of the [criminal] offense").

In August 2002 Start labeled Solaia Technology's infringement claims as "legal carnage," noting that "many observers are frustrated that the patent system is being used as a vicious legal weapon to generate revenue." Start then noted that, while Solaia Technology's attorneys in NSHN denied any connection between Solaia Technology and Schneider Automation, documents reveal "the relationship between these companies might be more intimately linked." Smedley hinted that "key details" in the Rockwell Automation antitrust case "continue to be revealed. Speculation and concern about certain misdeeds are on the rise." "Misdeed" means "a wrong deed: an immoral or criminal action." See Webster's Third New International Dictionary 1443 (1986).

categories of defamation *per se.* However, we hesitate to conclude that this statement falls outside the fair report privilege. Cursory research would have revealed to Start that the only section of the Sherman Antitrust Act cited in Rockwell Automation's complaint clearly states that a person found to have violated the act is guilty of a crime:

> "[E]very contract *** or conspiracy, in restraint of trade or commerce among the several States *** is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court." 15 U.S.C. §1 (2000).

This section does not refer to prosecution of such violations, but we cannot expect reporters to possess the same skills as lawyers and to venture further into the filigree of federal antitrust law, searching for a distinction between criminal and civil enforcement actions. In light of the language of the statute, we conclude that the statement was a fair abridgement of Rockwell Automation's antitrust complaint.

Plainly, freedom of the press is illusory if a cloud of defamation liability darkens the media's reports of official

---

Finally, in January 2003 Start published the industry veteran's letter, which observed, "there are people in the world," like Johnny Cochrane, the Washington, D.C., sniper, and Enron and WorldCom executives, "who want to make a lot of money and they don't care how they do it." Start later mentioned that "rumors have been flying around about the relationship that exists between Solaia and Schneider."

proceedings. See *Krauss v. The Champaign News Gazette, Inc.*, 59 Ill. App. 3d 745, 746-47 (1978) ("A robust and unintimidated press is a necessary ingredient of self-government"). We recognize that the media must have "breathing space" (see *Sullivan*, 376 U.S. at 271-72, 11 L. Ed. 2d at 701, 84 S. Ct. at 721) in order to act effectively and escape self-censorship. But we remind reporters it is objectivity and civility that mark our finest journalism. Reports of official proceedings must be as fair as they are ardent if they are to help the public assess the value of our government in action. Had Start's statement regarding the Sherman Antitrust Act strayed a bit farther from the statutory language, the implication left by the statement would have been actionable.

In sum, we hold that the fair report privilege does not yield to allegations that a media defendant reported with actual malice false statements made in an official proceeding. Further, we hold that there is no judicial-action limitation on the fair report privilege in Illinois. Finally, we remand this cause to the trial court, so the plaintiffs may proceed on their defamation claims regarding the statement in the letter to the editor and the statement that Niro was sued by Rockwell Automation.

## CONCLUSION

For the reasons that we have stated, we affirm in part and reverse in part the judgments below, and remand this cause to the circuit court.

*Judgments affirmed in part*
*and reversed in part;*
*cause remanded.*

CHIEF JUSTICE THOMAS took no part in the consideration or decision of this case.

JUSTICE FREEMAN, concurring in part and dissenting in part:

I agree with the majority's conclusion that certain statements made by defendants fall within one or more of the recognized categories of statements that are defamatory *per se*. I disagree, however, with the majority's conclusion that the fair report privilege shields defendants from liability for some of the statements they made. Therefore, I write separately to explain my position in this case.

The majority applies the fair report privilege to statements that were based upon the bare and untested allegations of a complaint. In my opinion, some action by the trial court is necessary to trigger application of the fair report privilege. Indeed, such a restriction on the fair report privilege is salutary and preserves a proper balance between the individual's right to protect his reputation and the public's interest in being informed of court proceedings.

The majority's willingness to apply the fair report privilege to the statements at issue is particularly troubling when considered in light of the court's concurrent holding that a showing of malice, whether actual malice or malice in fact, will not defeat the defendants' claimed protection under the fair report privilege. The majority's holding invites collusion between a party who files a frivolous complaint containing defamatory statements and a defendant who publishes the defamatory statements, with full knowledge of the falsity of the statements but with equal certainty of protection through application of the fair report privilege. Because I believe that the majority does not strike the proper balance between the rights of individual to their good reputation and the interest of the public in being informed of court proceedings, I respectfully dissent in part from the majority opinion.

## ANALYSIS

At issue in this case is the proper balance between an individual's right to a good reputation and the public's interest in being informed of court proceedings. As the majority recognizes, a defamatory communication violates an individual's right to a good reputation and gives rise to a cause of action to recover damages for the violation. See J. Lee & B.

Lindahl, Modern Tort Law §36:1, at 36–3 (2d ed. 2002); W. Keeton, Prosser & Keeton on Torts §111, at 771 (5th ed. 1984). A defamatory statement becomes actionable when it is actually communicated to a third person and understood by that person as being defamatory. Modern Tort Law §36:4, at 36–9; Prosser & Keeton on Torts §113, at 797-98. When a defamatory statement is published to a third person, that person in turn may be liable for republication of the communication to yet another individual. Modern Tort Law §36:4, at 36–11.

Two classes of privileges have evolved as exceptions to the general rule of liability for defamatory communications. Prosser & Keeton on Torts §§114, 115. The first class encompasses absolute privileges where immunity is conferred "regardless of motive and is based on the personal position or status of the actor." Modern Tort Law §36:24, at 36–39. Statements made in judicial proceedings are afforded immunity by absolute privilege. Prosser & Keeton on Torts §114, at 816. It is generally recognized that the fair and impartial administration of judicial proceedings, the search for truth, and the vindication of personal rights in legal proceedings may be fostered only through "total freedom for the exchange of ideas" (Modern Tort Law §36:25, at 36–40) and, consequently, require absolute immunity for statements made by judicial officers, attorneys, parties, and witnesses in the proceedings.

The second class encompasses conditional or qualified privileges where immunity is conferred because of "the occasion upon which the allegedly false statement is published." Modern Tort Law §36:24, at 36–39. A conditional or qualified privilege generally applies "where society's interest in compensating a person for loss of reputation is outweighed by a competing interest that demands protection." Modern Tort Law §36:32, at 36–47. See also Prosser & Keeton on Torts §115, at 824. A conditional or qualified privilege may be lost if the privilege is abused. Modern Tort Law §36:33, at 36–53; Prosser & Keeton on Torts §115, at 832. As this court has heretofore explained:

"Where no qualified privilege exists, the plaintiff need only show that the defendant acted with negligence in making the defamatory statements to prevail. [Citation.] However, once a defendant establishes a qualified privilege, a plaintiff must prove that the defendant either intentionally published the material while knowing the matter was false, or displayed a reckless disregard as to the matter's falseness." *Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill. 2d 16, 24 (1993).

Thus, where a person publishes a statement with knowledge of the falsity of the statement, a qualified privilege may not be sufficient to shield the person from liability. Likewise, where a person publishes a statement despite a high degree of awareness of its probable falsity or despite entertaining serious doubts as to truth of the statement, liability may not be defeated by application of a qualified privilege. *Kuwik*, 156 Ill. 2d at 24-25; *Mittelman v. Witous*, 135 Ill. 2d 220, 237 (1989).

As the majority notes correctly, the fair report privilege falls within the class of conditional or qualified privileges. Slip op. at 22. The privilege furthers the interest of the public to have information about official proceedings and public meetings. In *Medico v. Time, Inc.*, 643 F.2d 134 (3d Cir. 1981), the court explained the three rationales that have been used to justify the fair report privilege. First,

"an agency theory was offered to rationalize a privilege of fair report: one who reports what happens in a public, official proceeding acts as an agent for persons who had a right to attend, and informs them of what they might have seen for themselves. The agency rationale, however, cannot explain application of the privilege to proceedings or reports not open to public inspection." *Medico*, 643 F.2d at 140-41.

Second is a theory of public supervision:

"(The privilege is justified by) 'the security which publicity gives for the proper administration of justice. ... It is desirable that the trial of causes should take place under the public eye, not because the controversies of

one citizen with another are of public concern, but because it is of the highest moment that those who administer justice should always act under the sense of public responsibility and that every citizen should be able to satisfy himself with his own eyes as to the mode in which a public duty is performed.' " *Medico*, 643 F.2d at 141, quoting *Cowley v. Pulsifer*, 137 Mass. 392, 394 (1884).

The third rationale for the fair report privilege rests "on the public's interest in learning of important matters." *Medico*, 643 F.2d at 142. The linchpin, however, is that the information reported must be of some import. "Mere curiosity in the private affairs of others is of insufficient importance" to warrant granting the privilege. Note, *Privilege to Republish Defamation*, 64 Colum. L. Rev. 1102, 1111 (1964).

Looking at the theoretical underpinnings of the fair report privilege, it is clear that the privilege serves the interest of the public in information about governmental and court proceedings. Where the public is not clearly entitled to the information in question, such as where a meeting is not open to the public, where the information is not fair and accurate, or where the information is false, the interest of the public in such information is less compelling, and protection of the plaintiff's right to his good reputation may call for a new balance. In my opinion, the majority in the present case does not strike the proper balance between the right of the plaintiffs to their reputations and the interest of the public in obtaining information about court proceedings.

The majority adopts the position of the Restatement (Second) of Torts that the publication of defamatory matter concerning another in a report of an official action or proceeding is privileged. Slip op. at 22, citing Restatement (Second) of Torts §611 (1977). As explained in comment *d* of the Restatement (Second) of Torts:

"The privilege covered in this Section extends to the report of any official proceeding, or any action taken by any officer or agency of the government of the United States, or of any State or of any of its subdivisions.

> Since the holding of an official hearing or meeting is in itself an official proceeding, the privilege includes the report of any official hearing or meeting, even though no other action is taken. The filing of a report by an officer or agency of the government is an action bringing a reporting of the governmental report within the scope of the privilege.
>
> The privilege is thus applicable to the report of proceedings before any court, whether it is one of general or of special and limited jurisdiction." Restatement (Second) of Torts §611, Comment *d*, at 299 (1977).

Although the majority adopts the statement of the fair report privilege outlined in §611, the majority rejects the limitation imposed by comment *e* on the use of the fair report privilege. See slip op. at 25. Instead, the majority concurs in the holding of *Newell v. Field Enterprises, Inc.*, 91 Ill. App. 3d 735 (1980), that the fair report "privilege serves the public's interest in the judicial system, and this interest begins with the filing of a complaint." Slip op. at 25. I disagree.

I believe the interests of the citizens of Illinois are better served by adopting the position of the Restatement (Second) of Torts. Comment *e* provides in part:

> "*e. Necessity of official action in judicial proceedings.* A report of a judicial proceeding implies that some official action has been taken by the officer or body whose proceedings are thus reported. The publication, therefore, of the contents of preliminary pleadings such as a complaint or petition, before any judicial action has been taken is not within the rule stated in this Section. An important reason for this position has been to prevent implementation of a scheme to file a complaint for the purpose of establishing a privilege to publicize its content and then dropping the action. (See Comment *c*). It is not necessary, however, that a final disposition be made of the matter in question; it is enough that some judicial action has been taken so that, in the normal progress of the proceeding, a final decision will be

rendered." Restatement (Second) of Torts §611, Comment *e*, at 300.

The rationale for the restriction on the fair report privilege is explained thus by a leading treatise:

> "An important field for the privilege is the reporting of any judicial proceeding, no matter how inferior the tribunal, and regardless of its jurisdiction over the particular matter. The proceeding may be an ex parte one, so long as some official action is taken, even though it is only the holding of a hearing; but a mere contemplated lawsuit not yet begun is clearly not enough. Because of the opportunity afforded for malicious public defamation and even extortion, through suits begun and promptly discontinued, most courts are agreed that some official action is essential to the privilege. Thus it is the prevailing view, with some few courts to the contrary, that a pleading or a deposition filed in a case but not yet acted upon may not be reported under the claim of privilege." Prosser & Keeton on Torts §115, at 837.

I hasten to emphasize that under the approach advocated in comment *e* and followed by a number of jurisdictions, *the public will gain access to information* regarding the court proceedings, and the policy consideration for providing such access will be heeded. The issue, after all, is not whether the public has an interest in information concerning the court proceedings which is being denied. Rather, the issue is whether a media defendant reporting on the court proceedings may base its report on the bare, untested, and unsubstantiated allegations of a complaint. When some official action has been taken by the court in the proceedings, the media defendant *will be able to report on the proceedings, including the allegations of the complaint.* At that point, however, the media defendant may have access to additional information which will allow it to present a more balanced view of the court proceedings. Further, the oversight of the proceedings provided by the court and the possibility of sanctions for a frivolous complaint may stay the hand of a plaintiff whose sole purpose is to defame an

innocent individual. The public's interest in obtaining information about the court proceedings will be met. Concomitantly, the risk to the individual subjected to the defamatory statements in the complaint will be minimized.

I agree with the observations made by the court in *Sanford v. Boston Herald-Traveler Corp.*, 318 Mass. 156, 159, 61 N.E.2d 5, 7 (1945), in balancing the interests in an action for defamation:

> "Public policy requires a glare of publicity upon the doings of courts, even though individual litigants suffer unmerited harm. But the publication of accusations made by one party against another in a pleading is neither a legal nor a moral duty of newspapers. Enterprise in that matter ought to be at the risk of paying damages if the accusations prove false. To be safe, a newspaper has only to send its reporters to listen to hearings rather than to search the files of cases not yet brought before the court. The older doctrine of the [*Cowley v. Pulsifer*, 137 Mass. 392 (1884)] and [*Lundin v. Post Publishing Co.*, 217 Mass. 213, 104 N.E. 480 (1914)] cases still seems to us well founded in principle and without injustice in its practical operation. It is supported by the great weight of authority in other jurisdictions."

See also *Nixon v. Dispatch Printing Co.*, 101 Minn. 309, 312, 112 N.W. 258, 258 (1907) ("[I]f the filing of such a complaint must be construed as a judicial proceeding within the rule stated, then any one who happens to read the complaint after it is filed is privileged to publish it ***. *** If such be the law, then an easy and safe way has been provided whereby a party desiring to libel another may do so with impunity by entitling the libel in an action, labeling it a complaint, and filing it with the clerk"). The majority here applies the fair report privilege to statements that were based upon the bare and untested allegations of a complaint. In my opinion, some action by the trial court is necessary to trigger application of the fair report privilege. Indeed, a restriction on the privilege preserves a proper balance between the individual's right to protect his

reputation and the public's interest in being informed of court proceedings. Under the watchful eye of the trial court, the risk of collusion between the individual filing the frivolous, defamatory complaint and the media outlet republishing the defamatory allegations of the complaint is lessened.

The majority's concurrent holding that malice, whether actual malice or malice in fact, will not defeat a defendant's claimed protection under the fair report privilege only serves to throw the balance further off. In *Lulay v. Peoria Journal-Star, Inc.*, 34 Ill. 2d 112 (1966), plaintiff proprietor of a combined bakery, grocery store and restaurant in Peoria was cited by city health officers for sanitary code violations. Plaintiff proprietor satisfied the objections of the Department of Health and received his food license. The following day, defendant newspaper, after an interview with the director of the health department, published the allegedly defamatory article. The court first recognized that a privilege exists to report government proceedings. *Lulay*, 34 Ill. 2d at 114-15. The court then held:

> "The privilege to report governmental acts or utterances can only be defeated by proving that a particular publication was motivated solely by actual malice. [Citations.] As expressed in the Restatement of Torts, section 611, a publication reporting government proceedings is nonactionable unless published 'solely for the purpose of causing harm to the person defamed.' " *Lulay*, 34 Ill. 2d at 115.

Although the *Lulay* court spoke in terms of actual malice, the definition the court provided, that is, a communication made solely for the purpose of causing harm to the person defamed, was that of common law malice or malice in fact.

The court's holding in *Lulay* was followed in *Coursey v. Greater Niles Township Publishing Corp.*, 40 Ill. 2d 257, 261 (1968), where the court observed:

> "With respect to defendant's contention that the article was a privileged comment on quasi-judicial proceedings, the appellate court correctly stated the controlling principle as expressed in the Restatement of

Torts, §611, that a newspaper is privileged to report the activities of a 'municipal corporation or of a body empowered by law to perform a public duty *** although it contains matter which is false and defamatory, if it is (a) accurate and complete or a fair abridgement of such proceedings, and (b) not made solely for the purpose of causing harm to the person defamed.' "

In *Catalano v. Pechous*, 83 Ill. 2d 146 (1980), the court considered whether the plaintiffs, seven of the eight aldermen that comprised the city council of Berwyn, could maintain an action for a defamatory statement allegedly made by defendant Pechous at a council meeting, repeated by Pechous several months later to a reporter, and quoted by the reporter in a newspaper article. The plaintiffs argued the fair report privilege did not apply because the reporter did not attend the council meeting; the article was not published until five months after the council meeting; the article was based on an account given by Pechous; and not all of the statements by Pechous which appear in the article were made at the meeting. In discussing the concept of malice, the *Catalano* court noted that the *Lulay* court had actually defined common law malice, that is, a statement made for the purpose of causing harm to the person defamed, in holding that malice defeats the fair report privilege. *Catalano*, 83 Ill. 2d at 168. In the wake of *New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S.Ct. 710 (1964), however, recovery for a defamatory statement concerning a public official may be allowed only upon a showing of actual malice, that is, "only if it is established both that the utterance was false and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true." *Catalano*, 83 Ill. 2d at 155. The *Catalano* court then observed that it need not decide whether, as argued by the plaintiffs, the fair report privilege did not apply to the statement at issue in the first instance. The plaintiffs, all public officials, were not able to show actual malice on the part of the newspaper defendants, as required by *New York Times*. *Catalano*, 83 Ill. 2d at 168-69.

The majority rejects the holding of *Lulay*, and presents *Catalano* as support for its holding that a showing of malice, whether actual malice or common law malice, will not defeat application of the fair report privilege. The majority's analysis is overly dependent on *Catalano*, however. The *Catalano* court itself noted it was not holding that the fair report privilege applies where the individual claiming the privilege knew of the statement's falsity. The *Catalano* court observed:

> "We think it is also appropriate to state that in holding that Pechous is liable and that the other defendants are not, we are not, as the plaintiffs assert, applying different standards, and we are not indicating approval of the position taken by the court in *Edwards v. National Audubon Society, Inc.* (2d Cir. 1977), 556 F.2d 113, *cert. denied* (1977), 434 U.S. 1002, 54 L. Ed. 2d 498, 98 S. Ct. 647, that a newspaper, under some circumstances, is protected against liability in reporting a defamatory statement about a public official or public figure even if the newspaper knew that the statement was false." *Catalano*, 83 Ill. 2d at 170.

The majority's analysis enjoys greater support in the Restatement (Second) of Torts. See Restatement (Second) of Torts §611, Comment *b*, at 298 (1977).

The majority's decision on the issue of malice provides timely guidance for the Illinois courts. As noted by the majority, Illinois law has been in disarray as to whether a showing of malice defeats the fair report privilege. Slip op. at 22. Compare *Lykowski v. Bergman*, 299 Ill. App. 3d 157 (1998) (following *Lulay* and holding the privilege may be defeated by a showing of malice); *Kumaran v. Brotman*, 247 Ill. App. 3d 216 (1993); *Reed v. Northwestern Publishing Co.*, 129 Ill. App. 3d 133 (1984); *Emery v. Kimball Hill, Inc.*, 112 Ill. App. 3d 109 (1983); *Nagib v. News-Sun*, 64 Ill. App. 3d 752 (1978); *Colucci v. Chicago Crime Comm'n*, 31 Ill. App. 3d 802 (1975), with *Snitowsky v. NBC Subsidiary (WMAQ-TV), Inc.*, 297 Ill. App. 3d 304 (1998) (fair report privilege applies if the report is accurate and complete or a fair abridgment of the occurrence reported); *Gist v. Macon County Sheriff's Department*, 284 Ill.

App. 3d 367 (1996). See also *Berkos v. National Broadcasting Co.*, 161 Ill. App. 3d 476, 493 (1987) (Presiding Justice McMorrow, writing for the court, collecting cases and observing: "the question of whether the common law fair report privilege can be forfeited upon a showing that the defendant acted either with common law 'express malice' or constitutional law 'actual malice,' where the news media has falsely defamed a public official, a public figure, or a private figure with respect to a matter of 'public concern,' is apparently unsettled because of conflicting Illinois precedent"). Without venturing into the fray, I note simply that the majority's holding that a defamatory report is privileged if based on the contents of a complaint is exacerbated by the concurrent holding that malice does not defeat the fair report privilege.

It should be remembered that a plaintiff in a judicial proceeding enjoys an absolute privilege for defamatory statements he makes in the proceedings. As explained in a leading treatise, the privilege "does not depend for its existence upon the good faith of the defamer. An absolute privilege confers immunity regardless of motive and is based on the personal position or status of the actor." Modern Tort Law §36:25, at 36–40. To allow a newspaper to publish the defamatory statements the plaintiff includes in his complaint, and to give the newspaper immunity when the newspaper is aware of the falsity of the allegations in the plaintiff's complaint, is to degrade the right of the defamed individual to his good reputation without real necessity. What damage a plaintiff causes to the defamed individual by including defamatory statements in a complaint will be multiplied exponentially by publication of the defamatory statements in a newspaper. A complaint in a court proceeding will go unnoticed by the vast majority of the citizens of our state. Defamatory statements broadcast in a newspaper or other media outlet may magnify both the reach and the sting of the defamatory statements. A private individual in particular most likely will not have the resources to counter the defamatory allegations when they are given voice in a media outlet.

Again, the trade-off is not between affording a defamed individual the right of redress and denying the public's interest in access to information concerning judicial proceedings. Rather, the trade-off is between protecting the right of the individual to his good reputation and delaying, for a short time, publication of information about the court proceedings. I note that numerous jurisdictions that have considered the issue at bar have drawn a more appropriate balance, holding either that the fair report privilege does not extend to a report based on the contents of a complaint, or that the fair report privilege may be defeated by a showing of malice. See *Quigley v. Rosenthal*, 327 F.3d 1044 (10th Cir. 2003) (applying Colorado law and holding that the fair report privilege does not apply to the reporting of the contents of pleadings before any judicial action has taken place); *Stem v. Gannett Satellite, Information Network, Inc.*, 866 F. Supp. 355 (W.D. Tenn. 1994) (applying Tennessee law, court held that privilege applied to affidavit that was filed in court and became part of the judicial proceeding, but actual malice would defeat application of the privilege); *Parsons v. Age-Herald Pub. Co.*, 181 Ala. 439, 61 So. 345 (1913) (court action is required and publication must be without malice); *Johnson v. Johnson Publishing Co.*, 271 A.2d 696, 698 (D.C. 1970) ("If the publication fairly and accurately repeats the wife's assertions as contained in the complaint, the defense of qualified privilege is available to appellee absent proof that the article was published with malice"); *Murphy v. Maui Publishing Co.*, 23 Haw. 804 (1917) (court action is required for application of fair report privilege); *Flues v. New Nonpareil Co.*, 155 Iowa 290, 135 N.W. 1083 (1912) (official action is required and publication cannot be made with malice); *Paducah Newspapers, Inc. v. Bratcher*, 274 Ky. 220, 118 S.W.2d 178 (1938) (fair report privilege applies to report based on a complaint if the report is made without malice); *Sanford*, 318 Mass. 156, 61 N.E.2d 5 (official action is required); *Park v. Detroit Free Press Co.*, 72 Mich. 560, 568, 40 N.W. 731, 734 (1888) ("If pleadings and other documents can be published to the world by any one who gets access to them, no more effectual way of doing malicious mischief with impunity could be devised than filing papers containing false and scurrilous

charges, and getting those printed as news.); *Nixon*, 101 Minn. at 313, 112 N.W. at 259 ("a complaint or other pleading in a civil action, which has never been presented to the court for its action, is not a judicial proceeding within the rule"); *Brown v. Globe Printing Co.*, 213 Mo. 611, 112 S.W. 462 (1908) (court action is required for application of the fair report privilege); *Cox v. Lee Enterprises, Inc.*, 222 Mont. 527, 723 P.2d 238 (1986) (fair report privilege applies to a report that is based on a complaint, but the report must be made without malice); *Fitch v. Daily News Publishing Co.*, 116 Neb. 474, 217 N.W. 947 (1928) (court action is required and publication must be done without malice); *Costello v. Ocean County Observer*, 136 N.J. 594, 643 A.2d 1012 (1994) (official action is required and a showing of malice will defeat the privilege); *McCurdy v. Hughes*, 63 N.D. 435, 447, 248 N.W. 512, 516 (1933) (observing that numerous cases have held "that the rule of privilege does not apply to pleadings which, though filed, have not yet received judicial notice"); *Pollock v. Rashid*, 117 Ohio App. 3d 361, 690 N.E.2d 903 (1996) (the publication of a fair report of a pleading is privileged unless the report was published maliciously); *Mannix v. Portland Telegram*, 144 Or. 172, 23 P.2d 138 (1933) (court action is required for application of fair report privilege); *Weber v. Lancaster Newspapers, Inc.*, 2005 Pa. Super. 192, 878 A.2d 63 (2005) (fair report privilege applies to pleadings but malice in fact will defeat application of the privilege); *Williams v. Black*, 24 S.D. 501, 510, 124 N.W. 728, 732 (1910) (stating general rule that " 'the publication of the contents of a petition or of other pleadings or papers filed in civil proceedings before trials or before any action has taken place on such pleadings or papers by the court is not privileged' "), quoting 25 Cyc. 406, 407; *Baten v. Houston Oil Co.*, 217 S.W. 394, 398 (Tex. Civ. App. 1919) (statute declaring a fair, true, and impartial account of court proceedings "privileged[ ] does not justify the publication of a libelous written pleading, properly filed, upon which no action by the court, judge, or any other officer has been taken"); *Russell v. Thomson Newspapers, Inc.*, 842 P.2d 896 (Utah 1992) (official action required and report must be made without malice); *O'Brien v. Tribune Publishing Co.*, 7 Wash. App. 107,

117, 499 P.2d 24, 30 (1972) ("A newspaper has a qualified or conditional privilege to report legal proceedings provided the publication is a fair and accurate statement of the contents and is made without malice"); *Ilsley v. Sentinel Co.*, 133 Wis. 20, 113 N.W. 425 (1907) (official action required).

## CONCLUSION

I cannot join fully in today's opinion. I believe the opinion does not strike a proper balance between an individual's right to his good reputation and the public's interest in information regarding court proceedings. The majority applies the fair report privilege to statements that were based upon the bare and untested allegations of a complaint. In my opinion, some action by the trial court is necessary to trigger application of the fair report privilege. Indeed, a restriction is salutary, forestalling possible collusion between an individual who files a frivolous complaint and the media defendant who republishing the allegations of the complaint. As explained by the court in *Ilsley*, 133 Wis. at 24-26, 113 N.W. at 426-27:

> "The whole foundation for that privilege is the interest of the public to know the conduct of judicial officers and legislators, to the end that misconduct or incapacity may be promptly discovered and remedied. ***
>
> ***
>
> The fundamental reason is the same which demands that proceedings of courts and legislatures shall be open to the public. [Citations.] When this reason is understood, it obviously fails wholly to justify publication of defamatory contents of mere pleadings and other preliminary papers which have simply been filed in the clerk's office. In those the public have no concern until they are actually brought to the attention of some judicial officer and some action on his part is demanded based thereon. *** The fact that any one who wishes may, on other grounds, have access to such papers for examination, if any such right exists, has no bearing on the question. The degree of publicity likely to be so accomplished is trifling in comparison with general

publication, and, at best, results incidentally from a public policy of nondiscrimination by a mere clerk which is in no wise promoted by spreading abroad the information which one may acquire by such inspection. In absence of dominating public interest, surely the individual ought not to be subjected to such assaults upon his character and reputation as may result from general publication of charges which may thus be made. The author of a pleading is broadly privileged in asserting his claims against his opponent, and may, and often does, make the most damaging charges with little or no foundation. He may make them with no expectation of proving them, nay, with no purpose of ever proceeding further with his action, and yet furnish most salacious matter for the enterprising reporter upon whose industry the pleader may indeed have counted to render his charges effective to injure his opponent before the public, though he never expected any effect for them in court."

In my opinion, comment *e* to the Restatement (Second) of Torts carves out a proper balance between the individual's right to protect his reputation and the public's interest in being informed of court proceedings and should be followed by this court. In light of the foregoing, I respectfully dissent in part from the majority opinion.