NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 210605-U

NO. 4-21-0605

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 16, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| HEARTLAND BANK & TRUST COMPANY, an Illinois State Bank, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) | Woodford County |
| v. | ) | No. 20L8 |
| MEADOWS MENNONITE RETIREMENT COMMUNITY ASSOCIATION, INC., | ) ) ) | Honorable |
| Defendant-Appellant. | ) ) | Charles M. Feeney III, Judge Presiding. |

PRESIDING JUSTICE CAVANAGH delivered the judgment of the court. Justices Zenoff and Vancil concurred in the judgment.

**ORDER**

¶ 1   *Held*: A loan transaction between a trustee and the beneficiary of the trust, in which the trustee profited, was presumptively fraudulent, and absent clear and convincing evidence rebutting the presumption of fraud, the beneficiary was entitled, as a matter of law, to a rescission of the transaction.

¶ 2   In the circuit court of Woodford County, plaintiff, Heartland Bank & Trust Company, brought this action against defendant, Meadows Mennonite Retirement Community Association, Inc., for breach of contract—specifically, a default on a note—and to foreclose on a security agreement. Defendant responded with a counterclaim, in which defendant sought a rescission of the note and security agreement, together with compensatory and punitive damages, because plaintiff, a trustee, had breached its fiduciary duty to defendant, a beneficiary. The court granted plaintiff's motion for a summary judgment, denied defendant's cross-motion for a summary judgment, and granted plaintiff's motion, pursuant to sections 2-615 and 2-619 of the

Code of Civil Procedure (735 ILCS 5/2-615, 2-619 (West 2020)), for a dismissal of the counterclaim. Defendant appeals.

¶ 3    In our *de novo* review (see *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 579 (2006)), we conclude that (1) the counterclaim states a cause of action for breach of a fiduciary duty and (2) under the undisputed facts, defendant, rather than plaintiff, was entitled to a judgment as a matter of law on both the complaint and the counterclaim for rescission. Therefore, we reverse the summary judgment in plaintiff's favor and against defendant on plaintiff's complaint, and we reverse the summary judgment against defendant and in plaintiff's favor on defendant's counterclaim. Also, we remand this case for further proceedings not inconsistent with this order. Because of those dispositions, we do not reach defendant's further contention that the circuit court erred by denying defendant's postjudgment request to join the Illinois Attorney General as a necessary party.

¶ 4                                    I. BACKGROUND

¶ 5                                    A. The Three Trusts

¶ 6    Defendant, a nursing home in Chenoa, Illinois, is an Illinois not-for-profit charitable corporation. For the furtherance of its charitable mission, defendant was made the beneficiary of three trusts. Ann Schneckenburger, Susie M. Streid, and Juanita R. Streid, all of whom are deceased, created these trusts in their wills.

¶ 7    Under Ann Schneckenburger's will, the corpus of the trust is 116 acres. The income from the land is to be divided equally between her two sons, James and John Schneckenburger, who are still alive. When both of the sons are deceased, the trustee is to "liquidate said assets[,] and the trust shall then cease[,] and the money shall be distributed to

- 2 -

[defendant]." The trustee is "the Bank of Chenoa *** or its corporate successor," which, since May 31, 2001, has been plaintiff.

¶ 8        Susie M. Streid, in her will, gave her daughter, Juanita R. Streid, a life estate in all of Susie's land. After Juanita died, the land was to pass to the National Bank of Chenoa or its successor, in trust. Plaintiff is that successor. When Susie made her will, she owned a house in Meadows, Illinois (her will stated), and 207 acres in McLean County. After Juanita's death, the income from the house was to be paid annually, less operating expenses and maintenance, to the Meadows Mennonite Old People's Home, as defendant formerly was known. The income from the 207 acres was to be paid annually, less operating expenses and maintenance, to the Meadows Mennonite Church. Susie's will provided that "[n]o beneficiary shall assign its interest in said trust."

¶ 9        In her will, Juanita R. Streid noted that she owned an interest in 207 acres in McLean County, the same 207 acres described in Susie's will. Juanita's will conveyed the 207 acres to the Bank of Chenoa in trust. The income from the 207 acres was to be paid annually, less operating expenses and maintenance, to the Meadows Mennonite Church. Like Susie's will, Juanita's will provided that "[n]o beneficiary shall assign its interest in said Trust."

¶ 10        Juanita died on September 20, 1987. Her will and Susie's will provided that the two wills should be interpreted in harmony with one another and that the trusts therein should be administered jointly. Accordingly, on September 20, 1987, the McLean County circuit court ordered the combination of the Susie M. Streid trust and the Juanita R. Streid trust. The Bank of Chenoa was to administer the two trusts as if they were one trust.

¶ 11        By a merger that took effect on May 31, 2001, plaintiff became the corporate successor of the Bank of Chenoa. Consequently, plaintiff became the successor trustee of the Schneckenburger and Streid trusts.

¶ 12        On August 21, 2007, because Meadows Mennonite Church intended to cease operations as a charitable entity, the McLean County circuit court entered an order that, effective September 1, 2007, defendant would be substituted for the Meadows Mennonite Church in the Streid wills.

¶ 13                                    B. The Loan

¶ 14        On November 20, 2012, while plaintiff was the trustee of these trusts, Roger W. Hasler, in his capacity as defendant's chief financial officer, signed a promissory note. In the note, defendant, the "BORROWER," agreed to pay the principal amount of $500,000 to plaintiff, together with interest at the rate of 4.25%. The final maturity date of the note was November 20, 2013. If a payment were late by 10 or more days, defendant would be charged 5% of the regularly scheduled payment. "Upon default," the note continued, "including failure to pay upon final maturity, the interest rate on this Note shall be increased by 5.000 percentage points." In addition, defendant agreed to pay any attorney fees or expenses that plaintiff incurred in collecting the note.

¶ 15        The note was renewed seven times: November 20, 2013; November 20, 2014; November 20, 2015; November 18, 2016; November 18, 2017; November 14, 2018; and February 14, 2019. Hasler, on defendant's behalf, signed a new note for each renewal. Each new note stated that "[t]his Promissory Note is a replacement and renewal of the original Promissory Note."

¶ 16                                    C. The Security Agreement

¶ 17    On November 18, 2017, Hasler signed a "Commercial Security Agreement," in which defendant "grant[ed] to [plaintiff] a security interest in the Collateral to secure the Indebtedness." The term " 'Collateral' " was defined to include the following:

> "All *** accounts ***, *** money, other rights to payment and performance, and general intangibles (including but not limited to *** all payment intangibles)[.]"

¶ 18                    D. No More Renewals

¶ 19    On February 14, 2019, Hasler signed the seventh renewal of the note. This renewal had a maturity date of July 15, 2019.

¶ 20    On March 26, 2019, plaintiff informed defendant that there would be no further renewal of the note unless defendant made an immediate payment of $250,000 and a payment of the remaining balance soon thereafter.

¶ 21    On July 26, 2019, plaintiff's attorney, Robert L. Dawidiuk, wrote to defendant that plaintiff would "not renew the Note when it matures on July 15, 2019," and that if the note were still unpaid on that maturity date, "legal proceedings, including the foreclosure of the receivables, [might] be implemented without further notice."

¶ 22    In an affidavit filed on February 4, 2021, a manager of defendant, Ben Weinschneider, avers:

> "Despite the difficult financial problems facing [defendant], [defendant] timely made each and every payment on the Note. At all times relevant to this case, [defendant] regularly paid each monthly payment on the line of credit to [defendant]. Indeed, [defendant] continues to make monthly payments on the

loan[,] and [plaintiff] continues to accept monthly payments on the loan during *** this litigation."

¶ 23                                    E. A Proposed Forbearance Agreement

¶ 24        On July 19, 2019, Dawidiuk wrote to defendant's attorney, Jeffrey Strange, that plaintiff "would be willing to extend a Forbearance Agreement for your client's matured loan." The forbearance agreement would be for a six-month term, during which defendant would make only interest payments. Plaintiff's conditions were that defendant provide financial information, send a "draft proposed contract for sale of the business and real estate upon receipt," and agree to the "release of claims and defenses."

¶ 25                                    F. Plaintiff's Declaration of Default

¶ 26        On August 20, 2019, Dawidiuk wrote Strange that plaintiff had declared defendant to be in default. According to this letter, the balance that defendant owed plaintiff was $489,031.37, with interest accruing at the rate of $144.10 per day. Plaintiff demanded, on pain of legal proceedings, to be paid in full by August 30, 2019, at 5 p.m.

¶ 27                                    II. ANALYSIS

¶ 28        Defendant contends that, under the undisputed facts, plaintiff, a trustee, entered into a loan transaction with defendant, the beneficiary of the trust—a transaction in which plaintiff received a benefit. Defendant argues that (1) such a self-dealing transaction is presumptively fraudulent and (2) in the summary judgment proceedings, the burden was on plaintiff to come forward with evidence tending to rebut this presumption of fraud, specifically, clear and convincing evidence that the transaction was fair and reasonable. In responding to defendant's cross-motion for summary judgment, plaintiff presented no evidence, defendant notes, let alone clear and convincing evidence of the fairness and reasonableness of the

- 6 -

transaction. Because plaintiff in effect counted on the legal insufficiency of defendant's counterclaim—which, defendant maintains, was legally sufficient—defendant concludes that the party that was entitled to a judgment as a matter of law was defendant, not plaintiff.

¶ 29 Plaintiff counters that defendant's beneficial interests in the trusts were not part of the collateral for the loan and that the relationship between plaintiff and defendant, therefore, "was no more than a lender and borrower relationship." By plaintiff's understanding of Illinois law, "a fiduciary relationship which arises as a result of a trust does not extend to transactions between the trustee and beneficiary which have no relationship to the trust." Even if the security agreement should be interpreted as collateralizing the beneficial interests, plaintiff argues, "there is no evidence that [plaintiff] acted in bad faith or with undue influence." Besides, plaintiff observes, defendant "sought, consented to[,] and ratified the Loan transaction when the Loan was renewed every year since 2012."

¶ 30 These arguments by the parties do not appear to reflect any controversy about what the facts are. Rather, these arguments concern the legal effect of undisputed facts. In our reading of the briefs, we do not perceive any genuine issue of material fact. See 735 ILCS 5/2-1005(c) (West 2020). Defendant observes, "None of the factual allegations set forth in [defendant's] counterclaim or in the supporting affidavit of Ben Weinschneider attached to [defendant's] cross-motion for summary judgment were disputed by [plaintiff]." Plaintiff does not seem to disagree with that observation. Apart from Weinschneider's affidavit, the evidence in the summary judgment proceedings was made up of contractual documents and correspondence, the authenticity of which was uncontested. These documents seem straightforward in their meaning. We do not see how divergent inferences could be reasonably drawn from them, at least divergent inferences that legally matter.

¶ 31    The question, then, is whether, given these undisputed facts, plaintiff or defendant was "entitled to a judgment as a matter of law." *Id.* Entitlement to a judgment as a matter of law is analogous to entitlement to a directed verdict. The supreme court has held:

> "[I]f what is contained in the pleadings and affidavits would have constituted all of the evidence before the court and upon such evidence there would be nothing left to go to a jury, and the court would be required to direct a verdict, then a summary judgment should be entered." *Fooden v. Board of Governors of State Colleges & Universities*, 48 Ill. 2d 580, 587 (1971); see *Coole v. Central Area Recycling*, 384 Ill. App. 3d 390, 395 (2008).

¶ 32    To determine a party's entitlement to a judgment as a matter of law, we must ascertain what the relevant law is. Defendant suggests that plaintiff's "*statutory* fiduciary obligations to [defendant] are governed by the Illinois Trust Code and the Charitable Trust Act." (Emphasis in original.) However, the Illinois Trust Code (760 ILCS 3/101 *et seq.* (West 2020)) did not go into effect until January 1, 2020. So, it did not exist yet when defendant issued plaintiff the note and the renewals of the note. The Charitable Trust Act (Act) (760 ILCS 55/1 *et seq.* (2012)) existed, though.

¶ 33    The Act "applies to any and all trustees, as defined in Section 3 [(*id.* § 3)], holding property of a value in excess of $4,000." *Id.* § 2. Section 3 in turn defines a " '[t]rustee' " as "any person, *** corporation, *** or other legal entity holding property *** for any charitable purpose." *Id.* § 3. Plaintiff held property worth more than $4000 (the land in the trusts) for a charitable purpose: the present and future support of defendant, a charitable organization. Therefore, the Act applies to plaintiff.

¶ 34    Section 15(a)(1) of the Act provides as follows:

>    "(a) Charitable trustees are subject to certain duties otherwise defined in Illinois statutes and case law, which include but are not limited to the following:
>
>    (1) To avoid 'self-dealing' and conflicts of interest ***." *Id.* § 15(a)(1).

¶ 35    One of a trustee's duties, as defined in Illinois case law, is to avoid transactions with the beneficiary in which the trustee profits. See *Janowiak v. Tiesi*, 402 Ill. App. 3d 997, 1005 (2010). Such a transaction is tainted by a conflict of interest, even if it involves no trust property. The supreme court has held, "When the existence of a fiduciary relation has been established[,] the law presumes that *any* transaction between the parties, *by which the dominant party has profited*, is fraudulent." (Emphases added.) *Clark v. Clark*, 398 Ill. 592, 601 (1947). The Fourth District has echoed, "Once a fiduciary relationship is established, the law presumes that *any* transaction between the parties *in which the dominant party has profited* is fraudulent, a presumption that may be rebutted only by clear and convincing proof." (Emphases added.) *In re Estate of Long*, 311 Ill. App. 3d 959, 964 (2000). The rule is simply that "[a] presumption of fraud arises when a fiduciary benefits from a transaction involving the principal," regardless of whether the transaction involves the assets held in trust. *Estate of Alford v. Shelton*, 2017 IL 121199, ¶ 23.

¶ 36    Here is the reason for that rule. A trustee "owe[s] a duty of undivided loyalty to the trust and its beneficiary" (*Mucci v. Stobbs*, 281 Ill. App. 3d 22, 31 (1996)), and "the duty of loyalty applies when a trustee deals directly with a beneficiary in a transaction not involving trust property" (Bogert's Law of Trusts and Trustees § 543 (2024)). In its dealings with the beneficiary, the trustee may not "occupy two positions [that are] inconsistent with each other"

- 9 -

and "necessarily antagonistic." (Internal quotation marks omitted.) *Continental Illinois National Bank & Trust Co. of Chicago v. Kelley*, 333 Ill. App. 119, 127 (1948). In self-dealing, the trustee has a personal interest that is at war with the trustee's duty to maximize the benefit to the beneficiary. "Self-dealing occurs *** when the trustee personally has a financial interest in the transaction of such a nature that it might affect the trustee's judgment." Restatement (Third) of Trusts § 78, cmt. d (2007). "[A] trustee owes a fiduciary duty to serve the interests of the beneficiaries with total loyalty, excluding all self-interest." *Faville v. Burns*, 2011 IL App (1st) 110335, ¶ 40.

¶ 37          In the decision of how much interest to charge defendant for the loan, plaintiff's self-interest was at war with plaintiff's duty of undivided loyalty to defendant. As a lender, plaintiff had a selfish incentive to maximize the interest rate, whereas as a trustee, plaintiff had a selfless duty to get the terms most advantageous for defendant. The note's provisions for late penalties and attorney fees were self-dealing: they were advantageous to plaintiff and disadvantageous to defendant. The decision of whether to renew the note an eighth time pitted plaintiff's self-interest against defendant's interest.

¶ 38          Even the collateral in the security agreement could expose plaintiff to temptation. Granted, the collateral does not include trust property. Nor are "beneficial interests" specifically referenced in the description of the collateral. Nevertheless, defendant's right to an annual payment of income from the Streid trust is, in the words of the security agreement, a "right[ ] to payment." Thus, the description of the collateral is broad enough to encompass defendant's beneficial interest. Consequently, foreclosure might affect plaintiff's judgment in the management of the trust. Plaintiff could be tempted to skimp on maintenance and repairs so as to maximize the net income to plaintiff.

¶ 39        Such concerns of self-dealing do not seem to matter, in plaintiff's view, given that defendant "sought, consented to[,] and ratified the Loan transaction when the Loan was renewed every year since 2012." Proof of the beneficiary's consent, however—though relevant (see *Clark*, 398 Ill. at 602-03)—is not enough to rebut the presumption of fraud that arises from a transaction in which the trustee personally profits. In *Clark*, there was a dispute regarding whether the subservient party, the plaintiff, had the mental capacity to intelligently agree to the deed and lease in question. *Id.* at 602. The supreme court implied, however, that even the plaintiff's intelligent consent to the deed and lease would not save those transactions if the terms were unfair to her:

> "While the complaint in this case seeks to set aside the deed and lease on several different grounds, namely, those of undue influence on the part of the defendants, mental incapacity of the plaintiff, and the existence of a fiduciary relationship of which defendants had taken advantage to their own gain, it is not essential in order to avoid these instruments that plaintiff establish all of the grounds alleged. In cases where the evidence shows a fiduciary relationship, neither undue influence nor mental incapacity is necessary to be established in order to avoid the transaction. [Citation.] The question in all such cases is whether the dominant party who has obtained the benefit of the transaction has exercised good faith and not betrayed the confidence reposed in him. If so, the existence of a fiduciary relation will not invalidate the conveyance; but, as above pointed out, the burden of establishing the fairness and good faith of the transaction rests upon the one receiving the benefit thereof." *Id.*

Thus, notwithstanding the subservient party's unimpaired consent, the transaction still must pass a test of objective fairness, and the burden is on the dominant party to prove that the transaction passes that test. Unless the dominant party carries that burden, "the transaction will be set aside in equity." *Id.* at 601. Consent is no panacea.

¶ 40 To take another example, in *Long*, 311 Ill. App. 3d at 961, Edwin Long *consented* to a 15-year lease of his farm to Bruce Lyon, whom Long had named as a coexecutor of his will. After all, Long signed the lease (*id.* at 962)—just as defendant signed the note and the renewals. The appellate court did not gainsay the circuit court's finding that Long, " 'while aged and uneducated, was one to manage his own farm affairs' " (*id.* at 966). Even so, absent clear and convincing evidence that Lyon had "exercised good faith and did not betray the confidence reposed in him," Long's consent did not save the transaction. *Id.* at 967. The Fourth District held:

"Once a fiduciary relationship is established, the law presumes that any transaction between the parties in which the dominant party has profited is fraudulent, a presumption that may be rebutted only by clear and convincing proof. [Citations.] A fiduciary may rebut the presumption of fraud or undue influence by clear and convincing proof that he has exercised good faith and has not betrayed the confidence reposed in him. Significant factors in meeting that burden include a showing that the fiduciary made a frank disclosure of the information he had, he paid adequate consideration, and the principal had competent and independent advice." *Id.* at 964.

To prove that the profiting fiduciary did not betray the subservient party's confidence, the fiduciary must prove, by clear and convincing evidence, that the transaction was "fair and equitable." See *In re Estate of Miller*, 334 Ill. App. 3d 692, 698 (2002).

¶ 41    It does not appear that plaintiff presented any evidence at all, let alone clear and convincing evidence, of the fairness of the loan agreement. Instead, plaintiff relied on its different roles, as if to say, "That was me as a lender, not me as a trustee." Plaintiff's distinction between its loan department and its wealth management department is unconvincing. "Self-dealing is involved because the various departments [of the corporate trustee] are not separate persons." Restatement (Third) of Trusts § 78, cmt. d (2007).

¶ 42    Aside from a rather simplistic exchange of the lender hat for the trustee hat, defendant did not offer much in the way of rebuttal. In the record before us, we see no evidence of the reasonableness of the various interest rates in the note. The record appears to lack evidence, for example, of how the interest rates in the note compared to the interest rates that other lenders were offering at the time. Also, the record appears to lack evidence that defendant had competent and independent advice on whether to sign the note and the commercial security agreement. Maybe an independent adviser would have alerted defendant that the description of the collateral, in the security agreement, was problematic in the light of the anti-assignment provision in the Streid trust.

¶ 43    Given the presumption of fraud and the lack of evidence to rebut the presumption, a reasonable trier of fact would have no choice but to find against plaintiff on its complaint and for defendant on its counterclaim. See *Fooden*, 48 Ill. 2d at 587.

¶ 44                                III. CONCLUSION

¶ 45    For the foregoing reasons, we reverse the summary judgment in plaintiff's favor and against defendant on plaintiff's complaint, and we reverse the summary judgment against defendant and in plaintiff's favor on defendant's counterclaim. We remand this case for further proceedings not inconsistent with this order.

¶ 46         Reversed and remanded.